# EXHIBIT 1



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-8000

ASSISTANT SECRETARY FOR HOUSING-
FEDERAL HOUSING COMMISSIONER

**December 5, 2008**

**MORTGAGEE LETTER 2008-38**

**TO: ALL APPROVED MORTGAGEES**

**ATTENTION: SINGLE FAMILY SERVICING MANAGERS**

**SUBJECT: Home Equity Conversion Mortgages (HECMs)** – Clarification regarding borrower's recourse for repayment of HECM loan debt and termination of a HECM mortgage

The purpose of this Mortgagee Letter is to provide a policy clarification regarding the requirements for repayment of Home Equity Conversion Mortgages (HECMs) and for termination of a HECM mortgage.

Specifically, HUD Handbook 4235.1 REV-1, Home Equity Conversion Mortgages, provides in Paragraph 1-3C, that:

*The HECM is a "non-recourse loan". This means that the HECM borrower (or his or her estate) will never owe more than the loan balance or value of the property, whichever is less; and no assets other than the home must be used to repay the debt.*

Some program participants mistakenly infer from this language that a borrower (or the borrower's estate) could pay off the loan balance of a HECM for the lesser of the mortgage balance or the appraised value of the property while retaining ownership of the home. This is not correct and is not the intended meaning of the quoted provision. Non-recourse means simply that if the borrower (or estate) does not pay the balance when due, the mortgagee's remedy is limited to foreclosure and the borrower will not be personally liable for any deficiency resulting from the foreclosure. (For additional guidance please reference 24 CFR 206.27(b) (8)).

Most situations regarding the termination of a HECM mortgage fall into the following general categories:

1. If the mortgage is not due and payable, and the borrower desires to retain ownership of the property, the mortgage debt may be repaid in full at any time.

2. If the mortgage is due and payable and the borrower (or estate) desires to retain ownership of the property, the mortgage debt must be repaid in full. Lenders may assist the borrower (or estate) in obtaining other financing to pay off the HECM loan in full.

3. Whether or not the mortgage is due and payable the borrower may, at any time, sell the property for at least the lesser of the mortgage debt or the appraised value.

4. If the mortgage is due and payable and the borrower (or estate) will not be retaining ownership of the property, the property may be sold for at least the lesser of the unpaid mortgage balance or 95% of appraised value.

In any circumstance where a mortgagee agrees to the acceptance of less than the full mortgage balance, such sale of the property by the borrower (or the borrower's estate) should be an arm's length transaction. An arm's length transaction is characterized by the following (1) the absence of a relation between the buyer and seller; (2) a selling price and other conditions that would prevail in an open market environment; (3) transaction costs paid by the seller that are considered both reasonable and customary for the market in which the property is located; and (4) the adherence to ethical standards of conduct by all parties involved in the HECM short sale transaction, including the borrowers (or the estate), mortgagees and appraisers..

Any questions regarding this Mortgagee Letter may be directed to HUD's National Servicing Center at 1-888-297-8685 or **hsg-lossmit@hud.gov**. Persons with hearing or speech impairments may access this number via TDD/TTY by calling 1-877-TDD-2HUD (1-877-833-2483).

The clarifications in this Mortgagee Letter are effective immediately.

Sincerely,

Brian D. Montgomery
Assistant Secretary for Housing –
Federal Housing Commissioner

# EXHIBIT 2

# HOME EQUITY CONVERSION MORTGAGE (HECM) COUNSELING

**Presented by**

**Ken Scholen**
**Bronwyn Belling**

**Neighborworks Training Institute**
**May 2006**

C. Loan fees can generally be "financed," that is, added to the loan balance at loan closing. This means, in effect, that some or all of the cost of setting up the loan (closing costs, origination fee, insurance premium) can be paid with an extra loan advance at closing.

D. The loan balance (amount owed) rises over time. It grows because the borrower keeps getting loan advances and being charged interest on the outstanding balance while making no repayment until a future time.

E. No repayment is required on most reverse mortgages for as long as the borrower lives in the home as a principal residence. When the last surviving borrower dies, sells the home, or permanently moves away, then the full loan balance becomes due and payable.

F. There is a "non-recourse" limit on the borrower's repayment obligation. This important consumer safeguard means that the total amount owed by the borrower can never exceed the value of the home at the time the loan becomes due and payable. In seeking repayment, the lender does not have recourse to anything other than the home's value.

1) Even if the loan balance grows to be greater than the home's future value, the borrower's debt is limited by the value of the home.

2) The non-recourse feature protects the borrower and the borrower's estate and heirs from "deficiency judgments," that is, from being required to pay back more than the home's value.

2-5 REVERSE MORTGAGE INSURANCE

A. The purpose of reverse mortgage insurance is to permit borrowers to remain in their homes for as long as they choose, to protect borrowers with a non-recourse loan limit (see 2-4-F), and to protect lenders from the risk that some loan balances may exceed home values.

1) As shown in Figure 2-b, a reverse mortgage loan balance could grow to exceed the value of a home.

2) But the non-recourse feature of these loans (see 2-4-F) limits the borrower's liability to the value of the home.

3) Without reverse mortgage insurance (or some other method of "pooling" or spreading out the risk), lenders would face the loss of expected interest and, in some cases, principal.

B. The risk of loss is managed by reverse mortgage insurance (and other risk-pooling methods) in two basic ways: 1) controlling the risk of loan losses by controlling the amount of the loan advances, and 2) charging a premium on all loans to create a reserve fund for covering loan losses.

1) Loss risk is controlled by relating the amount of the loan advances to the life expectancy (age) of the borrower, the value of the home, and the cost of the loan:

a. the longer the life expectancy (that is, the lower the age), the smaller the loan advances;

b. the greater the home value, the greater the loan advances; and

c. the greater the loan costs, the smaller the loan advances.

2) A loan loss reserve is created by charging a premium on all loans sufficient at a minimum to cover expected losses. The type of premium or risk-pooling charge can be structured in various ways.

2-6 BASIC TYPES OF REVERSE MORTGAGES There are three basic types of reverse mortgages. **Tab 10** discusses these different types in detail.

A) Single-purpose reverse mortgages are offered by some state and local government agencies. Each loan can only be used for a single purpose. For example, some are limited to home repairs, others to paying property taxes. These plans generally have maximum income eligibility requirements, but the cost is usually very low or moderate.

B) Federally-insured reverse mortgages are Home Equity Conversion Mortgages (HECMs).

C) Proprietary reverse mortgages are developed, owned, and insured by private companies. They are the most expensive type of reverse mortgage, and generally only provide competitive loan advance amounts on the most highly valued homes. At present, one of these plans is available nationwide, and the other is available in the most populous states.

# EXHIBIT 3



About Reverse Mortgages for Seniors (HECM) - HUD Page 1 of 3

Housing
About Housing
Contact us
Keywords
Single Family
Audience groups
Buying a home
Events & training
FHA insured loans
Common questions
Housing counseling
HUD homes/ REO
Owning a home
Reference guide
Regulatory programs
Hospitals
Multifamily
GSE Regulatory Oversight
OAHP
Reading room
Online forums
Work online
HUD news
Homes
Resources
Communities
Working with HUD
Tools
Webcasts
Mailing lists
RSS Feeds
Help

# About Reverse Mortgages for Seniors - Section 255 - Home Equity Conversion Mortgages (HECM)

- About the HECM Program
- How the HECM Program Works
- HECM Public Service Announcement

Information by State
Esta página en español
Print version

**Did You Know?**

**SUBSCRIBE** to the Single Family Housing email list. You will get frequent updates to the HOC Reference Guide, training and event announcements, mortgagee letters, FHA Mortgage limits, and notices about your Single Family HECM business.

**About the HECM Program:**

The HECM FHA insured reverse mortgage can be used by senior homeowners age 62 and older to convert the equity in their home into monthly streams of income and/or a line of credit to be repaid when they no longer occupy the home. The loan, commonly known as HECM, is funded by a lending institution such as a mortgage lender, bank, credit union or savings and loan association. To assist the homeowner in making an informed decision of whether this program meets their needs, they are required to receive consumer education and counseling by a HUD-approved **HECM counselor**.

HECM counselors will discuss program eligibility requirements, financial implications and alternatives to obtaining a HECM and provisions for the mortgage becoming due and payable. Upon the completion of HECM counseling, the homeowner should be able to make an independent, informed decision of whether this product will meet their needs. You can also use this handy **Reverse Mortgage Calculator** to help you see if you qualify.

Homeowners who meet the eligibility criteria can complete a reverse mortgage application by contacting a FHA-approved lending institution such as a bank, mortgage company, or savings and loan association. If you need assistance locating a FHA-approved lender, you can request a listing of FHA-approved lenders from the HECM counselor or use HUD's searchable listing.

**Borrower Requirements:**

- Age 62 years of age or older
- Own your property
- Occupy your property as primary residence
- Participation in a consumer information session given by an approved **HECM counselor**

**Mortgage Amount Based On:**

- Age of the youngest borrower
- Current interest rate
- Lesser of appraised value or the FHA insurance limit

**Financial Requirements:**

- No income or credit qualifications are required of the borrower
- No repayment as long as the property is the primary residence

http://web.archive.org/web/20080411055741/http://www.hud.gov/offices/hsg/sfh/hecm/hec... 3/7/2011

- Closing costs may be financed in the mortgage

**Property Requirements:**

- Single family home or 1-4 unit home with one unit occupied by the borrower
- HUD-approved condominiums
- Manufactured homes and leased land
- Meet FHA property standards and flood requirements

**How the Home Equity Conversion Mortgage Program Works:**

Homeowners 62 and older who have paid off their mortgages or have only small mortgage balances remaining, and are currently living in the home are eligible to participate in HUD's reverse mortgage program. The program allows homeowners to borrow against the equity in their homes. Homeowners can select from five payment plans:

- Tenure - equal monthly payments as long as at least one borrower lives and continues to occupy the property as a principal residence.
- Term - equal monthly payments for a fixed period of months selected.
- Line of Credit - unscheduled payments or in installments, at times and in amount of borrower's choosing until the line of credit is exhausted.
- Modified Tenure - combination of line of credit with monthly payments for as long as the borrower remains in the home.
- Modified Term - combination of line of credit with monthly payments for a fixed period of months selected by the borrower.

Homeowners whose circumstances change can restructure their payment options for a nominal fee of $20.

Unlike ordinary home equity loans, a HUD reverse mortgage does not require repayment as long as the home is the borrower's principal residence. Lenders recover their principal, plus interest, when the home is sold. The remaining value of the home goes to the homeowner or to his or her survivors. You can never owe more than your home's value.

If the sales proceeds are insufficient to pay the amount owed, HUD will pay the lender the amount of the shortfall. HUD's Federal Housing Administration (FHA) collects an insurance premium from all borrowers to provide this coverage.

The amount a homeowner can borrow depends on their age, the current interest rate, other loan fees and the appraised value of their home or FHA 's mortgage limits for their area, whichever is less. Generally, the more valuable your home is, the older you are, the lower the interest, the more you can borrow.

For example, based on a loan with an interest rates of approximately 9 percent, and a home qualifying for $100,000, a 65-year-old could borrow up to 22 percent of the home's value; a 75-year-old could borrow up to 41 percent of the home's value; and, an 85-year-old could borrow up to 58 percent of the home's value. The percentages do not include closing costs because these charges can vary.

There are no asset or income limitations on borrowers receiving HUD's reverse mortgages.

There are also no limits on the value of homes qualifying for a HUD reverse mortgage. The value of the home will be determined by an appraisal. However, the amount that may be borrowed is derived from the lower of the appraisal amount or FHA mortgage limit for the area, which varies from $200,160 to $362,790. For Alaska, Guam, Hawaii and the Virgin Islands, the FHA mortgage limits may be adjusted up to 150 percent of the ceiling depending on the area. The

FHA limits usually increase each year. As a result, owners of higher-priced homes can't borrow any more than owners of homes valued at the FHA limit.

HUD's reverse mortgage program collects funds from insurance premiums charged to the homeowners. Homeowners are charged an upfront insurance premium which is 2 percent of the maximum claim amount that may be borrowed plus a .5 percent annual premium.

**Technical Guidance:**

This program is authorized by the Housing and Community Development Act of 1987, Section 417, Public law 100-242 (12 U.S.C. 1715z-20). Program regulations are in 24 CFR 206. This program is administered by the Office of Single Family Program Development in HUD's Office of Housing-Federal Housing Administration.

**Return to the HECM homepage**

U.S. Department of Housing and Urban Development
451 7th Street S.W., Washington, DC 20410
Telephone: (202) 708-1112 TTY: (202) 708-1455
Find the address of a HUD office near you

# EXHIBIT 4-1

 # Reverse Mortgages Q & A

**September 1989**

The U. S. Department of Housing and Urban Development (HUD) is sponsoring a small demonstration project to provide additional housing options for older homeowners. Under this project, HUD will insure 2,500 home equity conversion -- or reverse -- mortgages between July 24, 1989 and September 30, 1991. These mortgages will be available from certain HUD-approved lending institutions, and will be insured under the government's Federal Housing Administration (FHA) insurance program.

Fannie Mae strongly supports this program and the viable options it offers our nation's elderly homeowners. We have agreed to purchase two types of adjustable-rate reverse mortgage insured by FHA. To help you learn more about this program, we have provided the following answers to some of the most commonly asked questions about the demonstration and Fannie Mae's participation.

**Q: What is an FHA-insured reverse mortgage?**

A: A reverse mortgage is a type of home equity conversion mortgage that enables you, as an older homeowner, to tap the equity you have in your home. With a reverse mortgage, you essentially borrow against the value of your home, and receive monthly or line-of-credit payments from a mortgage lender to supplement your income. The lender charges you interest on the payments. No repayment of the loan is required unless you sell the home or you no longer occupy it as a *principal residence*. Payments will continue if, for health reasons, you live somewhere other than the home for up to 12 consecutive months. After that time, the lender, with permission of the HUD field office, may declare the mortgage due and payable.

When you sell your home or vacate it for other reasons, the accrued interest, plus what the lender has paid you or on your behalf through the years, are due and payable, usually from the proceeds from the sale of your home. Any proceeds in excess of the amount owed the lender belong to you or to your estate.

**Q: Who is eligible for an FHA-insured reverse mortgage?**

A: You, and any co-borrowers, must be at least 62 years old and either own your home free and clear or nearly free and clear to be eligible for a reverse mortgage. You also must agree to accept mortgage counseling from one of the 465 HUD-approved counseling agencies available nationwide.

property. No deficiency judgment may result from your reverse mortgage. The FHA insurance covers any further financial obligation to the lender.

**Q: Will my heirs owe anything to the mortgage lender if I die?**

A: Upon your death, the loan balance, consisting of payments made to you plus accrued interest and mortgage insurance premiums, becomes due and payable. Your heirs may repay the loan by selling the home, or by refinancing the mortgage so that they may keep the home. If the loan exceeds the value of your property, your heirs will owe no more than the value of the property. FHA insurance will cover any balance due the lender. No additional financial claims may be made against your heirs or estate.

**Q: If my home appreciates in value during the mortgage term, who will be entitled to that money?**

A: Under a reverse mortgage *without shared appreciation*, you are legally required to pay back to the lender only the amount of the loan plus accrued interest and mortgage insurance premiums. Any money remaining after the mortgage is paid would go to you or, upon your death, to your heirs.

HUD also plans to insure reverse mortgages with *shared appreciation*. Under this option, you agree to pay the lender an amount of money equal to a percentage of the future appreciation in your home's value in exchange for a higher reverse mortgage payment. This appreciation sharing is in addition to the rate of interest charged on the loan advances. Currently, *Fannie Mae will not be purchasing reverse mortgages with shared appreciation.*

**Q: What if I decide to sell my home?**

A: If you choose to sell your home, the outstanding loan balance plus accrued interest and mortgage insurance premiums becomes due and payable to the mortgage lender. You or your estate will receive any proceeds exceeding the loan balance.

**Q: Can I sell my home to my children and continue to live in it?**

A: Whether you sell your home to your children or any other individual, the reverse mortgage will be due and payable at settlement. After the loan is repaid, any arrangement for your continued occupancy of the property must be made with the new owners.

**Q: When can I apply for an FHA-insured reverse mortgage?**

A: Because this is a demonstration program and only a limited number of reverse mortgages are available initially, interested homeowners are encouraged to apply early. If the program proves beneficial to senior citizens and mortgage lenders, the federal government may insure more mortgages under the program.

# EXHIBIT 4-2



FannieMae
HECM
Turn your home's value into a source of ready cash

# Home Equity Conversion Mortgage (HECM) Consumer Fact Sheet

**August 2004**

To provide additional housing finance options for homeowners age 62 or older, the US Department of Housing and Urban Development (HUD) provides reverse mortgages under the Home Equity Conversion Mortgage (HECM) program. These mortgages are available from HUD-approved lending institutions and are insured under the government's Federal Housing Administration (FHA) insurance program.

Fannie Mae strongly supports the HECM program and provides funding for reverse mortgages. To help you learn more, we have provided the following answers to some of the most commonly asked questions about the program and Fannie Mae's participation in it.

**Q: What is a HECM?**

A: A HECM is a special type of mortgage that enables homeowners age 62 or older to tap the equity in their homes. It can provide the maximum amount of flexibility to address your particular financial needs — whether it is a lump sum to pay an unexpected hospital bill or a stream of regular payments to supplement your monthly income. Unlike traditional home equity loans, no repayment of the HECM loan is required until you no longer occupy the home as your principal residence. At that time, the lender, with HUD's permission, will declare the mortgage due and payable.

With a HECM, you borrow against the value of your home, and receive loan proceeds according to the payment plan that you select. These plans are described on the following pages. As a borrower, you are permitted to change payment plans at any time after origination. You may change payment plans as many times as you wish.

When you sell your home or vacate it for other reasons, the loan balance, which includes the total amount you borrowed plus accrued interest and mortgage insurance premiums, is due and payable, usually from the proceeds from the sale of your home. Any proceeds in excess of the amount owed the lender belong to you or to your estate.

**Q: Will my heirs owe anything to the mortgage lender if I die?**

A: Upon your death, the loan balance, consisting of payments made to you or on your behalf plus accrued interest, becomes due and payable. Your heirs may repay the loan balance by selling the home or by paying off the HECM loan so that they may keep the home. If the loan balance exceeds the value of your property, your heirs will owe no more than the value of the property. FHA insurance will cover any balance due the lender. No additional financial claims may be made against your heirs or estate.

**Q: If my home appreciates in value during the mortgage term, who will be entitled to that money?**

A: With a HECM you are legally required to pay back to the lender only the outstanding balance. Any money remaining after the mortgage is paid goes to you or, upon your death, to your heirs.

**Q What if I decide to sell my home?**

A: If you choose to sell your home, the outstanding loan balance becomes due and payable to the mortgage lender. You can pay the loan balance with proceeds from the sale of your home, and you or your estate will receive any proceeds exceeding the loan balance.

**Q: Can I sell my home to my children and continue to live in it?**

A: If you sell your home to your children or any other individual, the HECM will be due and payable at settlement. After the loan is repaid, any arrangement for your continued occupancy of the property must be made with the new owners.

**Q: What are some of my responsibilities as a homeowner with a reverse mortgage?**

A: To keep your real estate taxes and homeowners insurance current. And to properly maintain your home so that it's value does not diminish.

**Q: Where can I apply for a HECM?**

A: Any HUD-approved lender can participate in the HECM program. A list of HECM lenders in your area is available by calling Fannie Mae at 1-800-7FANNIE.

**About Fannie Mae**

Fannie Mae provides this information so you can learn more about your home finance options. Fannie Mae is a privately managed, stockholder-owned company. It has been chartered by Congress to fulfill the public mission of providing low-cost mortgage funds to Americans with low, moderate, or middle incomes. Fannie Mae does not lend money to consumers, but buys mortgages from a national network of about 3,000 approved lenders who do originate mortgage loans. By selling their loans to Fannie Mae, or pooling them to issue Mortgage-Backed Securities, lenders replenish their supply of capital so they can make more mortgage loans to American home buyers.

3900 Wisconsin Avenue, NW
Washington, DC 20016-2892

HI005C08/04 ©2004, Fannie Mae

# EXHIBIT 5



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-0500

OFFICE OF GENERAL COUNSEL

July 25, 2007

MEMORANDUM FOR: Margaret Burns, Director, Office of Single Family Program Development, HU

FROM: Bruce S. Albright, Assistant General Counsel, Single Family Mortgage Division, CIS

SUBJECT: HECMS Non-Recourse Feature and HECMS for Cooperative Housing

This is in response to your memorandum in which you stated that a participant at a HECM counselor training session questioned the "non-recourse" feature of the HECM program. HUD's response to the question was that if the heirs wish to keep the property, the loan balance must be paid in full, while only 95% of the appraised value is required if the heirs sell the home.[1] You stated that you were troubled by this apparent inconsistency and asked for our clarification as to what the program statute and regulations actually require.

We think that there appears to be some confusion as to the definition of "non-recourse." A non-recourse loan means that in the event of default, the lender can take legal action against only the property, i.e., foreclosure, and cannot seek personal liability against the borrower, such as legal action to obtain a deficiency judgment.[2] Thus, the concept of recourse relates to what legal actions a lender may take to recover a debt upon default. This concept is separate from whether or not the lender would be willing to accept payment of less than the full amount owed on the debt *before* resorting to legal action, i.e., whether the HECM lender will accept payment of 95% of the appraised value instead of foreclosing.[3]

---

[1] For simplicity, we use the term "estate" or "heirs" in this memorandum to refer generically to the subsequent owner(s) of the property upon the homeowner's death, which may be the estate itself, or the devisees, heirs, or beneficiaries, depending on the terms of the will or trust, if any, and state law.

[2] If a secured loan is not paid, then as a general rule, the lender may either sue the borrower personally on the note or may foreclose on the collateral, or both. Some states, however, have a "one-action" rule, requiring the lender to choose between the two remedies, or requiring the lender to foreclose as the first remedy before seeking personal liability under the note through a deficiency judgment. *See generally* Keyles, Foreclosure Law & Related Remedies (1995). A non-recourse loan means that the lender's only recourse under the loan terms is foreclosure and the borrower is not personally liable. *See* Talamo, The Real Estate Dictionary 107 (4th ed. 1986). In other words, the lender may not sue under the note, either in lieu of foreclosure or after foreclosure in the event that sale of the collateral at foreclosure is insufficient to cover the loan, i.e., a deficiency judgment.

[3] Paragraph 1-3.C. of the HECM Handbook states "The HECM is a 'non-recourse' loan. This means that the HECM borrower (or his or her estate) will never owe more than the loan balance or the value of the property, whichever is less . . . ." As just explained, this definition of "non-recourse" is not quite accurate, so we suggest that the handbook be revised accordingly.

The HECM statute does not use the term "recourse" or "non-recourse," but section 255(d)(7) provides that the Secretary may insure a HECM only if it provides that "the homeowner shall not be liable for any difference between the . . . indebtedness and the amount recovered by the mortgagee from . . . the net sales proceeds from the dwelling . . . ." Thus, the statute provides that HECMs are non-recourse to the extent that there may be no deficiency judgment, i.e., the borrower is not liable for the balance of the note remaining after the net sales proceeds from the foreclosure have been applied towards the note.[4]

The regulations provide that the HECM will be fully non-recourse, prohibiting all personal liability, including deficiency judgments. Section 206.27(b)(8) of the regulations provides that the mortgage shall provide that "[t]he mortgagor shall have no personal liability for payment of the mortgage balance. The mortgagee shall enforce the debt only through sale of the property. The mortgagee shall not be permitted to obtain a deficiency judgment against the mortgagor if the mortgage is foreclosed."[5] The HECM note and mortgage do, in fact, contain the provisions that the statute and regulations require them to contain. Paragraph 9 of the note provides: "Lender may enforce its rights under this Note only through sale of the Property." Paragraph 10 of the mortgage provides: "Borrower shall have no personal liability for payment of the debt secured by this Security Instrument. Lender may enforce the debt only through sale of the Property. Lender shall not be permitted to obtain a deficiency judgment against Borrower if the Security Instrument is foreclosed."

The mere fact that the loan is non-recourse, however, does not mean that the lender must accept the borrower's offer to pay off the loan for less than the full balance. That is a separate issue, not governed by the HECM statute, but rather set by FHA policy as provided in the regulations.[6]

Thus, the 95% short sale is provided only by regulation, as follows: When the mortgage becomes due and payable, e.g., upon the borrower's death, sale of the property, failure to occupy the property, etc., the full mortgage balance will become due and payable, as provided in section 206.27 of the regulations. If the balance is not paid, the mortgagee may foreclose and file a claim with HUD, roughly equal to the mortgage balance plus expenses, minus the appraised value of the property, as provided in sections 206.125 and 206.129 of the regulations. However, HUD also permits a HECM short sale, i.e., the mortgagor or the estate[7] may sell the property for 95% of its

---

[4] As noted in footnote 1, a non-recourse loan means that the lender can neither 1) sue directly on the note in lieu of foreclosing nor 2) obtain a deficiency judgment after foreclosure. As just quoted, the statute prohibits only the latter, so the statute provides that the HECM is non-recourse only in the sense of prohibiting deficiency judgment, i.e., read literally, there is no statutory prohibition against the lender's suing directly under the note in lieu of foreclosure.

[5] Thus, although the statute prohibits only deficiency judgments, the regulation goes further and prohibits *any* personal liability under the HECM, i.e., it also prohibits suing directly on the note in lieu of foreclosing.

[6] Section 255(d)(7) as originally enacted provided that the homeowner would not be liable for the difference between the debt and the amount recovered by the mortgage from "the foreclosure sale." The "foreclosure sale" language was replaced in the 1990 amendment to the statute with the current "sales proceeds" language. HUD's 1989 final rule providing for the 95% short sale predated this statutory amendment, making it clear that the later "sales proceeds" language was not the origin for HUD's short sale policy. For this and several other reasons, we don't think section 255(d)(7) can be read to mandate short sales. Please let us know if you would like us to elaborate on this point.

This policy of requiring either repayment of the loan in full or sale of the property for 95% of the appraised value applies equally to the original HECM borrowers as well as to the borrower's estate, as section 206.123(b) defines

appraised value, and the HECM mortgagee may file a shortfall claim with HUD for the difference between the mortgage balance and the sales proceeds, as provided in sections 206.125(c) and 206.129.[8] This is similar to the pre-foreclosure sale authorized under the forward mortgage program.

Neither the proposed nor final HECM rules explain why the borrower (or estate) must pay off the loan in full if he wishes to keep the home but need pay only the appraised value (or 95% of it) if he sells the home. We suggest, however, that the regulation drafters reasoning for the difference in policy was probably the same as that in the forward mortgage program, which is the financial risk to FHA that would be created if HUD permitted the homeowner to both keep the home and pay only appraised value. In other words, if the heirs want to keep the home and had the choice between paying off the full loan balance (resulting in no FHA insurance claim) or paying the lesser amount of appraised value (resulting in a claim), the heirs would always choose the latter; there is no disincentive against causing FHA to pay a claim. The more claims (and losses) FHA incurs, the more it must raise insurance premiums, increasing the cost of the program to new borrowers. Therefore, HUD requires the heirs to sell the home if wishes to pay off the balance for less than what is owed.

As you noted to Matthew Forman of my staff, there appears to a loophole in the HECM short sale policy, which is that HUD does not require the sale to be at arms length. For example, the elderly homeowner could sell the property to the heirs (or some other straw buyer) for 95% of appraised value, with a side agreement that the heirs will let the homeowner continue to live in the property (although the homeowner runs the risk that the heirs will renege on the agreement after the property is conveyed to them). In the forward mortgage program, HUD requires pre-foreclosure sales to be made at arms length, i.e., the homeowner could not sell the property to his heirs.[9] We could not find any such restriction in the HECM program and suggest that you consider imposing one if you are concerned about this loophole.

Please contact Matthew Forman at (202) 708-0080, ext. 5217, if you have any questions or desire further assistance.

---

mortgagor to include the mortgagor's estate where the regulations refer to the mortgagor's sale of the property.

[8] You inquired only about the 95% policy, which applies only when the mortgage is due and payable. Under section 206.125(c) of the regulations, HUD will also pay a short sale claim even when the mortgage is not due and payable if the borrower sells the property for 100% of appraised value. We are not clear why HUD requires only 95% when the mortgage is due and payable but 100% when it is not.

[9] Mortgagee Letters 94-45 and 00-05.

1

HECM Non-Recourse Bullet Points

Items 1- 3 addresses FHA's policy with regard to when the HECM loan becomes due and payable.

1. Retain the home

A. When the mortgage becomes due and payable, the mortgagor or mortgagor's estate may wish to retain the home. They may do so, however, they must pay the mortgage balance, including any accrued interest and MIP, in full. See 24 CFR 206.125. Note, this is a regulatory requirement.

B. When the mortgage becomes due and payable, the heir who inherits the home, which is security for the HECM, may wish to retain the home. They may do so, however, they must pay the mortgage balance, including any accrued interest and MIP, in full. The heir is not personally liable on the mortgage. The heir can renounce his inheritance, thus making the mortgagor's estate responsible for paying the mortgage balance. Lien holders retain their full rights as to payment and means of enforcement. See CJS Wills section 1949

2. Foreclosure

A. When the mortgage becomes due and payable and the mortgagor or mortgagor's estate does not wish to retain the home, and it does not wish to sell the home, the mortgagee (in most cases the mortgagee will be HUD) may initiate foreclosure. See 24 CFR 206.125(d).

B. When the mortgage becomes due and payable and the heir, who inherits the home that is subject to the mortgage, does not wish to neither retain the home nor sell the home, the mortgagee (in most cases the mortgagee with be HUD) may initiate foreclosure.

3. Sale

A. When the mortgage becomes due and payable the mortgagor or mortgagor's estate may sell the property for at least 95% of the appraised value. See 24 CFR 206.125(a)(2) and (c). All the net proceeds from the sale are paid to the mortgagee to settle the debt obligation.

B. The question becomes, will FHA allow an heir, who is not an obligor on the mortgage or the note, to sell the property for at least 95% of the appraised value, when the mortgage becomes due and payable, thus allowing the mortgagee to file a claim for the difference, if any? The regulations cover a sale by the mortgagor or mortgagor's estate as an obligor on the mortgage and note; not an heir, but does it really matter who sells the property?

4. What is the real question FHA is asking?

A. If the property is transferred to an heir through intestate or testate succession, can the heir retain the mortgaged property but only pay 95% of the appraised value to settle the debt obligation rather than pay the mortgage balance in full?

(1). If this is the question, whether it is an heir, a mortgagor, or mortgagor's estate, no one can keep the mortgaged property and only pay 95% of the appraised value. The mortgage balance must be paid in full.

(2). The 95% of the appraised value only applies to a sale of the property. See 24 CFR 206.125(c).

(3). In the case of an heir, the heir obtains the property subject to the mortgage, thus if the heir would like to keep the property, he must pay the full mortgage balance. The heir has no personal liability, however, the lien holder has full rights and its recourse is against the mortgaged property.

B. Is the transferring of property to an heir through intestate or testate succession considered a sale of the property, thus allowing the mortgagor or mortgagor's estate to sell the property to the heir for 95% of the appraised value?

(1). The transferring of property through intestate or testate succession is not considered a sale. An heir would obtain the property subject to the mortgage.

(2). The mortgagor or mortgagor's estate may sell the property, however, to whomever they wish because FHA does not require a sale of the property that is security for the FHA insured HECM to be at "arms length." Thus, the mortgagor or mortgagor's estate may sell the property to an heir for 95% of the appraised value.

5. FHA uses the term estate and heirs interchangeably. This is legally inaccurate. There is a fundamental difference between an heir and an estate, thus the terms should not be used interchangeably. An estate is the assets and liabilities of a mortgagor not an individual. The personal representative of the estate has a duty to dispose of the assets and liabilities of the mortgagor. An heir is an individual who does not have any personal liability for the debt and obligations of the deceased mortgagor. An heir inherits the estate (i.e., assets and liabilities) of the deceased mortgagor.

# EXHIBIT 6

**9-10 DUE AND PAYABLE MORTGAGES.** <TOP> The local HUD Office should follow
the procedures in HUD Handbook 4330.1 for evaluating the conditions that would cause the mortgage to be due and payable and lead to foreclosure, and for the payoff requirements for due and payable mortgages.

## APPENDIX 1 <TOP>

MODEL MORTGAGE FORM
(HOME EQUITY CONVERSION)
[See Instructions Attached]

FHA Case No.

____________________[Space Above This Line For Recording Data]________________

MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on , 19 . The mortgagor is , whose address is ("Borrower"). This Security Instrument is given to , which is organized and existing under the laws of , and whose address is ("Lender"). Borrower has agreed to repay to Lender amounts which Lender is obligated to advance, including future advances, under the terms of a Home Equity Conversion Loan Agreement dated the same date as this Security Instrument ("Loan Agreement"). The agreement to repay is evidenced by Borrower's Note dated the same date as this Security Instrument ("Note"). This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note, up to a maximum principal amount of Dollars (U.S. $ ); (b) the payment of all other sums, with interest, advanced under paragraph 5 to protect the security of this Security Instrument or otherwise due under the terms of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to Lender, with power of sale, the following described property located in County, Michigan:

which has the address of
[Street] [City]

[State] [Zip Code]

("Property Address")

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note.

2. Payment of Property Charges. Borrower shall pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreement.

3. Fire, Flood and Other Hazard Insurance. Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire. This insurance shall be maintained in the amounts, to the extent and for the periods required by Lender or the Secretary of Housing and Urban Development ("Secretary"). Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss to Lender instead of to Borrower and Lender jointly. Insurance proceeds shall be applied to restoration or repair of the damaged Property, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied first to the reduction of any indebtedness under a Second Note and Second Security Instrument held by the Secretary on the Property and then to the reduction of the indebtedness under the Note and this Security Instrument. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right; title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

4.  Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence after the execution of this Security Instrument and Borrower (or at least one Borrower, if initially more than one person are Borrowers) shall continue to occupy the Property as Borrower's principal residence for the term of the Security Instrument.  "Principal residence" shall have the same meaning as in the Loan Agreement

Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted.  Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the

loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

5.  Charges to Borrower and Protection of Lender's Rights in the Property.  Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in Paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.  Borrower shall promptly discharge any lien which has priority over this Security Instrument in the manner provided in Paragraph 12(c).

If Borrower fails to make these payments or the property charges required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

To protect Lender's security in the Property, Lender shall advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities as defined in the Loan Agreement.  Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

6.  Inspection.  Lender or its agent may enter on, inspect or make

appraisals of the Property in a reasonable manner and at reasonable times provided that Lender shall give the Borrower notice prior to any inspection or appraisal specifying a purpose for the inspection or appraisal which must be related to Lender's interest in the Property. If the Property is vacant or abandoned or the loan is in default, Lender may take reasonable action to protect and preserve such vacant or abandoned Property without notice to the Borrower.

7. Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation, or other taking of any part of the Property, or for conveyance in place of condemnation shall be paid to Lender. The proceeds shall be applied first to the reduction of any indebtedness under a Second Note and Second Security Instrument held by the Secretary on the Property, and then to the reduction of the indebtedness under the Note and this Security Instrument. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

8. Fees. Lender may collect fees and charges authorized by the Secretary.

9.Grounds for Acceleration of Debt.

(a) Due and Payable. Lender may require immediate payment in full of all sums secured by this Security Instrument if:

(i) A Borrower dies and the Property is not the principal residence of at least one surviving Borrower; or

(ii) All of a Borrower's title in the Property (or his or her beneficial interest in a trust owning all or part of the Property) is sold or otherwise transferred and no other Borrower retains title to the Property in fee simple or retains a leasehold under a lease for less than 99 years which is renewable or a lease having a remaining period of not less than 50 years beyond the date of the 100th birthday of the youngest Borrower (or retaining a beneficial interest in a trust with such an interest in the Property).

B sells property -- does 95% rule apply?

(b) Due and Payable with Secretary Approval. Lender may require immediate payment in full of all sums secured by this Security Instrument, upon approval of the Secretary, if:

(i) The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower; or

(ii) For a period of longer than 12 consecutive months, a Borrower fails to occupy the Property because

of physical or mental illness and the Property is not
the principal residence of at least one other Borrower;
or

      (iii)  An obligation of the Borrower under this
Security Instrument is not performed.

      (c)  Notice to Lender.  Borrower shall notify Lender
whenever any of the events listed in this Paragraph 9
(a)(ii) and (b) occur.

      (d)  Notice to Secretary and Borrower.  Lender shall notify
the Secretary and Borrower whenever the loan becomes due and
payable under Paragraph 9 (a)(ii) and (b).  Lender shall not
have the right to commence foreclosure until Borrower has
had 30 days after notice to either:

      (i)  Correct the matter which resulted in the Security
Instrument coming due and payable; or

      (ii)  Pay the balance in full; or

      (iii)  Sell the Property for the lesser of the balance
or 95% of the appraised value and apply the net
proceeds of the sale toward the balance; or

      (iv)  Provide the Lender with a deed in lieu of
foreclosure.

      (e)  Trusts.  Conveyance of a Borrower's interest in the
Property to a trust which meets the requirements of the
Secretary, or conveyance of a trust's interests in the
Property to a Borrower, shall not be considered a conveyance
for purposes of this Paragraph 9.  A trust shall not be
considered an occupant or be considered as having a
principal residence for purposes of this Paragraph 9.

      (f)  Mortgage Not Insured.  [Optional]  Borrower agrees that
should this Security Instrument and the Note not be eligible
for insurance under the National Housing Act within /1 from
the date hereof, Lender may, at its option, require
immediate payment in full of all sums secured by this
Security Instrument.  A written statement of any authorized
agent of the Secretary dated subsequent to   /1 from the
date hereof, declining to insure this Security Instrument
and the Note, shall be deemed conclusive proof of such
ineligibility.  Notwithstanding the foregoing, this option
may not be exercised by Lender when the unavailability of
insurance is solely due to Lender's failure to remit a
mortgage insurance premium to the Secretary.

    10.  No Deficiency Judgments.  Borrower shall have no personal
liability for payment of the debt secured by this Security Instrument.

Lender may enforce the debt only through sale of the Property. Lender shall not be permitted to obtain a deficiency judgment against Borrower if the Security Instrument is foreclosed. If this Security Instrument is assigned to the Secretary upon demand by the Secretary, Borrower shall not be liable for any difference between the mortgage insurance benefits paid to Lender and the outstanding indebtedness, including accrued interest, owed by Borrower at the time of the assignment.

11. Reinstatement. Borrower has a right to be reinstated if Lender has required immediate payment in full. This right applies even after foreclosure proceedings are instituted. To reinstate this Security Instrument, Borrower shall correct the condition which resulted in the requirement for immediate payment in full. Foreclosure costs and reasonable and customary attorney's fees and expenses properly associated with the foreclosure proceeding shall be added to the principal balance. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the Security Instrument.

12.Lien Status.

(a)Modification.

Borrower agrees to extend this Security Instrument in accordance with this Paragraph 12(a). If Lender determines that the original lien status of the Security Instrument is jeopardized under state law (including but not limited to situations where the amount secured by the Security Instrument equals or exceeds the maximum principal amount stated or the maximum period under which loan advances retain the same lien priority initially granted to loan advances has expired) and state law permits the original lien status to be maintained for future loan advances through the execution and recordation of one or more documents, then Lender shall obtain title evidence at Borrower's expense. If the title evidence indicates that the property is not encumbered by any liens (except this Security Instrument, the Second Security Instrument described in Paragraph 13(a) and any subordinate liens that the Lender determines will also be subordinate to any future loan advances), Lender shall request the Borrower to execute any documents necessary to protect the lien status of future loan advances. Borrower

---

1/ Lenders are authorized, but not required, to add Paragraph 9(f) to the first security instrument. If used, a period may be inserted in the two blanks expressed either in number of days or months, which is not shorter than 60 days and not longer than 8 months.

agrees to execute such documents. If state law does not permit the original lien status to be extended to future loan advances, Borrower will be deemed to have failed to have performed an obligation under this Security Instrument.

(b) Tax Deferral Programs.

Borrower shall not participate in a real estate tax deferral program, if any liens created by the tax deferral are not subordinate to this Security Instrument.

(c) Prior Liens.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in; legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to all amounts secured by this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one more of the actions set forth above within 10 days of the giving of notice.

13. Relationship to Second Security Instrument.

(a) Second Security Instrument. In order to secure payments which the Secretary may make to or on behalf of Borrower pursuant to Section 255(i)(1)(A) of the National Housing Act and the Loan Agreement, the Secretary has required Borrower to execute a Second Note and a Second Security Instrument on the Property.

(b) Relationship of First and Second Security Instruments. Payments made by the Secretary shall not be included in the debt under the Note unless:

(i) This Security Instrument is assigned to the Secretary; or

(ii) The Secretary accepts reimbursement by the Lender for all payments made by the Secretary.

If the circumstances described in (i) or (ii) occur, then all payments by the Secretary, including interest on the payments, but excluding late charges paid by the Secretary, shall be included in the debt under the Note.

(c) Effect on Borrower.  Where there is no assignment or reimbursement as described in (b)(i) or (ii) and the Secretary makes payments to Borrower, then Borrower shall not:

(i)  Be required to pay amounts owed under the Note, or pay any rents and revenues of the Property under Paragraph 19 to Lender or a receiver of the Property, until the Secretary has required payment in full of all outstanding principal and accrued interest under the Second Note; or

(ii)  Be obligated to pay interest or shared appreciation under the Note at any time, whether accrued before or after the payments by the Secretary, and whether or not accrued interest has been included in the principal balance under the Note.

(d)  No Duty of the Secretary.  The Secretary has no duty to Lender to enforce covenants of the Second Security Instrument or to take actions to preserve the value of the Property, even though Lender may be unable to collect amounts owed under the Note because of restrictions in this Paragraph 13.

14.  Forbearance by Lender Not a Waiver.  Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

15.  Successors and Assigns Bound; Joint and Several Liability.  The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender.  Borrower may not assign any rights or obligations under this Security Instrument or under the Note, except to a trust that meets the requirements of the Secretary.  Borrower's covenants and agreements shall be joint and several.

16.  Notices.  Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method.  The notice shall be directed to the Property Address or any other address all Borrowers jointly designate.  Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower.  Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this Paragraph 16.

17.  Governing Law; Severability.  This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located.  In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.  To

this end the provisions of this Security Instrument and the Note are declared to be severable.

18. Borrower's Copy. Borrower shall be given one conformed copy of the Note and the Security Instrument.

NON-UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

19. Assignment of Rents. [Use this language unless prohibited by state law.] Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by this Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Paragraph 19.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by this Security Instrument is paid in full.

20. Foreclosure Procedure. [For illustration only. Needs state adaptation as provided in the instructions attached.] If Lender requires immediate payment in full under Paragraph 9, Lender may invoke the power of sale and any other remedies provided in this Paragraph 20, including, but not limited to, reasonable attorney's fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in Paragraph 16. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by applicable law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorney's fees; (b) to all sums secured by this

Security Instrument, and (c) any excess to the person or persons legally entitled to it.

[Add any state-specific provisions in accordance with the instructions attached and HUD Handbook 4165.1 REV-1, Chapter 4]

[Number as final paragraph.] Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)].

[ ] Condominium Rider [ ] Planned Unit Development Rider

[ ] Shared Appreciation Rider [ ] Other [Specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

______________________________ ______________________________ (SEAL)
Borrower

______________________________ ______________________________ (SEAL)
Borrower

____________________[Space Below This Line For Acknowledgement]________________

Instructions for Model Mortgage Form (Home Equity Conversion)

HUD requires that a security instrument follow the form and content of the approved FNMA/FHLMC security instrument for the jurisdiction, except where HUD has determined that differences are needed to reflect HUD policy and practice. The following explains those differences. Additional instructions are found in Chapter 4, HUD Handbook 4165.1 and Chapter 6, HUD Handbook 4235.1.

Language Preceding Uniform Covenants

Use FNMA/FHLMC language but:

a. Add a box for the FHA Case No. as shown on the Model Form.

b. For a Mortgage, delete the language beginning with "THIS MORTGAGE" or "THIS DEED OF TRUST" through "covenants and agreements under this Security Instrument and Note." Substitute the language shown on the Model Form. The phrase "up to a maximum principal amount of Dollars (U.S. $ )" should be omitted in jurisdictions where there is no

legal requirement to state the maximum principal amount in a mortgage or deed of trust. If the phrase is used, the blank should be completed with an amount equal to or greater than 150% of the maximum claim amount.

c. For a Deed of Trust, follow the instructions in "b" above, except that the first three sentences of the Model Form must be further revised to read as follows:

> This DEED OF TRUST ("Security Instrument") is made on , 19 . The grantor [or trustor] is ("Borrower"). The trustee is ("Trustee"). The beneficiary is , which is organized and existing under the laws of , and whose address is ("Lender").

d. For Colorado deeds of trust, Georgia security deeds and Louisiana mortgages, the FNMA/FHLMC forms should be consulted for guidance regarding additional adaptation of the initial language of the Security Instrument, including language describing a note for Louisiana.

e. For Maine and New York in which FNMA and FHLMC use "plain English" forms, the format and language should be based on FNMA/FHLMC forms for other states provided that the language is in conformity with applicable law.

The Model Form uses the FNMA/FHLMC language for Michigan as an example. The form may include variations to the standard language that have been approved by FNMA and/or FHLMC.

Uniform Covenants

The form should designate the paragraphs preceding Paragraph 20 on foreclosure procedures as "Uniform Covenants". The text of these paragraphs must be used as presented in the Model Form without any change. FNMA/FHLMC language may not be substituted. If change is needed to make requirements of state or local law or practice, written approval from HUD is needed before the change is made.

Non-Uniform Covenants

The form should designate the paragraphs beginning with Paragraph 19 on assignment of rents as "Non-Uniform Covenants".

a. The FNMA/FHLMC paragraph on foreclosure procedures will need adaptation to reflect HUD policy. The Model Form contains an adaptation of the FNMA/FHLMC language for Michigan as an example. Following the phrase "If Lender requires immediate payment in full under Paragraph 9" as shown in Paragraph 20 of the Model Form, the mortgage should use the foreclosure procedures paragraph of the current approved FNMA/FHLMC form (including language regarding payment of costs such as attorney's fees) as a guide with any necessary adaptation to conform to these instructions. Language in the

FNMA/FHLMC paragraph regarding notice and acceleration should be omitted.  For Maine and New York, Lenders should use foreclosure language based on these instructions and other FNMA/FHLMC forms that are not "plain English" forms provided that the language will authorize foreclosure in conformity with applicable law.  The mortgage must include the Lender's right to a public sale of the Property, including a power of sale if legally permissible in the jurisdiction in which the property is located even if mortgages are usually foreclosed through a judicial proceeding.

b.  The paragraphs following Paragraph 20 should contain provisions required to adapt the mortgage to the laws and practices of the particular jurisdiction in which the Property is located. The text of these paragraphs should be the same as the FNMA/FHLMC non-uniform covenants for the jurisdiction in which the Property is located. Changes to the FNMA/FHLMC paragraphs and additional material may be included if needed to conform to requirements of state law or practice.  The paragraph entitled "Riders to this Security Instrument" should be used as shown in the Model Form instead of as shown in the FNMA/FHLMC forms.

c.  Any special language or notices required by applicable law should appear following the non-uniform covenants using the FNMA/FHLMC form as a guide.

Signatures, etc.

Use the FNMA/FHLMC format at the end of the mortgage except that:

a.  Witness lines may be omitted if state and local law does not require witnesses for mortgages.

b.  HUD does not require the Borrower's social security number to appear on the mortgage.

## APPENDIX 2   <TOP>

MODEL FIXED RATE NOTE FORM
(HOME EQUITY CONVERSION)

FHA Case No.

State of 1

NOTE

, 19

[Property Address]

1.DEFINITIONS

# EXHIBIT 7

Y 1.1/5: 100-21

Calendar No. 68

100TH CONGRESS 1st Session | SENATE | REPORT 100-21

# HOUSING AND COMMUNITY DEVELOPMENT ACT OF 1987

---

## REPORT

OF THE

## COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS UNITED STATES SENATE

TO ACCOMPANY

S. 825

together with

ADDITIONAL VIEWS

UNIVERSITY OF ALASKA
ANCHORAGE

MAY 1 1987

U.S. GOVERNMENT DOCUMENTS
LIBRARY

MARCH 24, 1987.—Ordered to be printed

---

U.S. GOVERNMENT PRINTING OFFICE
91-010 WASHINGTON : 1987

*n 126.—Requirements for State Approval for Mortgage Insur- nce for Hospitals*

section (a) would establish an alternative procedure for satis- the "certification of need" requirement governing mortgage ınce for hospitals.

section (b) would require the Secretary of HUD to issue im- nting regulations within 90 days of enactment of this Act.

*n 127.—Release of Pool Funds*

sections (a) and (b) would direct HUD to release special funds ıave been set aside under written agreements with certain ıd state housing authorities under section 236 of the National ng Act. These pool funds are to be used to strengthen the fi- ıl feasibility of state-insured multi-family housing, following nents entered into between HUD and certain state and local ies. The affected agencies would have 18 months to apply for e of their funds. Amounts remaining after these applications nded would be rescinded.

*n 128.—Increase in Authority to Insure Adjustable Rate ıngle Family Mortgages*

section (a) would increase the authority of FHA to insure ad- le rate mortgages (ARMs) from the current 10 percent to a ıed 40 percent of the previous years' volume of insurance.

section (b) would make conforming amendments to accommo- he increase in the FHA ARMs cap.

*n 129.—Limitation on Certain Secondary Market Fees*

section would prevent imposition of user fees on certain gov- ınt sponsored secondary mortgage market agencies.

section (a)—Federal National Mortgage Association (Fannie would prohibit the federal government from charging any fee those that Federal Reserve Banks now charge for acting as agents.

section (b)—Government National Mortgage Association e Mae): would limit fees to 6 basis points on the guarantee of ties backed by one- to four-family FHA and VA mortgages. ın other guarantees could be no higher than needed for actu- ıoundness. Fees for commitments of administrative expenses not be charged to allocate scarce guarantee authority to the t bidder on an auction basis. Fees would remain at the levels ce on September 1, 1985, unless an increase is needed to administrative costs.

section (c)—Federal Home Loan Mortgage Corporation (Fred- ıc): would prohibit the federal government from charging any cept those that the Federal Reserve Banks now charge for as fiscal agents.

*n 130.—Fannie Mae Cumulative Voting*

section would amend the FNMA Charter Act to permit the Mae Board of Directors, with the approval of the voting s of a majority of Fannie Mae shares, to eliminate the right ıulative voting in the election of board members. This would permit FNMA to adopt the straight—or one share, one vote per vacancy—method to ensure that control of Fannie Mae remains broadly dispersed.

*Section 131.—Mortgage Insurance Program Loss Reduction*

Subsection (a) would require the HUD Secretary to take appropriate administrative action to reduce losses on mortgage insurance programs.

Subsection (b) would authorize the Secretary of HUD to require that mortgagees and lenders disclose to HUD the taxpayer identification numbers of borrowers under the National Housing Act. The Secretary would be required to establish safeguards to ensure that this information is used only to enforce the requirements of the Act.

Subsection (c) would direct the Secretary of HUD to review annually the rates of early serious defaults and claims involving lenders under the National Housing Act. A lender experiencing a rate of early defaults or claims that is higher than normal for the lender's area would be required to submit a report that (1) explains the reasons for the high rate of early defaults and claims and (2) sets forth a plan and timetable for corrective action. A mortgagee that fails to submit the required report or to carry out the plan of corrective action may be suspended from participation in FHA mortgage insurance programs.

*Section 132.—Mortgages on Hawaiian Homelands and Indian Lands*

Subsections (a) and (b) would transfer programs for insurance of mortgages on Hawaiian homelands and Indian lands to the General Insurance Fund from the Mutual Mortgage Insurance Fund.

Subsection (a)(2) would amend the Act to allow native Hawaiians who own property financed with an FHA insured mortgage to pass on ownership of that property to their children or surviving spouse who do not meet the legal definition of Hawaiian native.

*Section 133.—FHA Title I Regulations*

Subsection (a) would give any applicant for FHA insurance on property improvement or manufactured home loans under Title I of the National Housing Act the option of complying with either the regulations in effect prior to January 15, 1986 or the new regulations published on October 25, 1985 to be effective on January 15, 1986. The new rule would take full effect on January 1, 1988.

Subsection (b) would require HUD to reopen the rule for public comment and account for the comments received.

*Section 134.—Home Equity Conversion Mortgage Insurance Demonstration*

This section would create a five-year demonstration program to facilitate the use and promotion of home equity conversion mortgages (HEC) and provide elderly homeowners with a safe way to turn the equity in their home into a stream of income.

Subsection (a) would add a new section—Section 254—to Title II of the National Housing Act.

Subsections 254(a)(1)–(a)(3) would describe the general purposes of the demonstration program.

Subsections 254(b)(1)–(b)(3) would define key phrases used in the section.

Subsections 254(c)(1)–(c)(3) would authorize the Secretary to insure any HEC mortgage eligible for insurance under the section and to make commitments for the insurance of such mortgages prior to the date of their execution or disbursement to the extent the Secretary makes certain determinations.

Subsections 254(d)(1)–(d)(8) would delineate the requirements that a mortgage must satisfy to be eligible for insurance under the section.

Subsections 254(e)(1)–(e)(3) would delineate certain disclosures that each mortgagee under this program must make to individual home owners.

Subsections 254(f)(1)–(f)(5) would delineate certain information that must be provided to home owners prior to executing an HEC mortgage. The information would be provided either by HUD or third-party entities.

Subsection 254(g) would place three limits on the insurance authority established under this section. First, no mortgage could be insured under this section after September 30, 1991, unless a commitment to insure was issued on or before such date. Second, the subsection would limit the total number of mortgages insured under this section to 2,500. Third, insurance coverage under this section would be limited to mortgages of $67,500 in non-high cost areas and $90,000 in high-cost areas.

Subsections 254 (h)(1) and (h)(2) would authorize the Secretary to enter into such contracts, make such investigations and publish and distribute such reports as the Secretary determines to be necessary, desirable or appropriate under the section.

Subsections 254 (i)(1) and (i)(2) would provide additional protections—and appropriate methods for achieving such protections—for the home owner and lender.

Subsection 254(j) would authorize HEC mortgage insurance only where the mortgage defers repayment obligation until death of the home owner and the homeowner's spouse, voluntary sale of the house or the occurrence of other events specified in the regulations.

Subsections 254(k)(1)–(k)(3) would require the submission of certain reports to Congress.

Subsections (b)(1) and (b)(2) of this bill would establish a procedure and time frame for issuing regulations implementing Section 254.

*Section 135.—Authority to Purchase Second Mortgages*

Subsections (a) and (b) would permanently extend the authority of Fannie Mae and Freddie Mac to purchase second mortgages for home purchase or improvement, which would otherwise expire on October 1, 1987.

*Section 136.—Miscellaneous Amendments*

Subsection (a) would amend section 223 of the National Housing Act, which contains miscellaneous FHA mortgage insurance programs, to make sections 223 (a) and (d) consistent with other provisions of the Act that provide for negotiated interest rates.

Subsection (b) would amend section 232(i)(2)(B) of the National Housing Act, which establishes authority to insure loans for the purchase and installation of fire safety equipment in nursing homes, intermediate care facilities, and board and care homes, to permit the borrower and lender to negotiate the interest on the loan. The section is amended to provide consistency with section 232(d)(3)(B) and other provisions of the Act that provide for a negotiated interest rate.

Subsection (c) would change an incorrect reference in section 236(i)(1) from subsection "(h)" to "(f)(4)."

Subsection (d) would amend section 244(f) by striking out paragraph (2) and redesignating the following paragraphs accordingly. Subsection (f)(2) now refers to a nonexistent "second sentence of subsection (d)."

Subsection (e) would change an incorrect capitalization of the word "Mortgagor" in section 247(a)(2).

Subsection (f) would amend sections 248 (a) and (d) of the Act, which are concerned with single family mortgage insurance on Indian lands, to use the defined term "trust or otherwise restricted land" consistently in section 248.

Subsection (g)(1) would amend section 253(b) of the Act to base the definition of "net appreciated value" in the multifamily shared appreciation mortgage program on the actual program cost after completion, as approved by the Secretary, rather than basing it on the speculative measures of estimated value or replacement cost. The amendment would eliminate the possibility that the mortgagee, at the time of sale, would be entitled to share in residual receipts notes that had been executed by the mortgagor during construction. The amendment should also minimize cost increases because mortgagees would have an incentive to limit change orders, thereby keeping the cost basis down and increasing the amount of appreciation to be shared.

Subsections (g)(2) and (g)(3) would amend section 253(c) of the Act, concerning insurance benefits in the event of default, to indicate that multifamily shared appreciation mortgages are obligations of the General Insurance Fund, rather than the Mutual Mortgage Insurance Fund.

Subsection (h) would amend section 810(h) of the Act, concerning housing for the Armed Forces, to conform with other provisions of the Act that provide for negotiated interest rates.

Subsection (i) would amend sections 203(k)(3)(B) and 241(b)(3) to refer to "borrower" and "financial institution" instead of "mortgagor" and "mortgagee" so as to make these sections internally consistent.

*Section 137.—Change in the Definition of Veteran*

This section would amend the definition of "veteran" in sections 203(b)(2) and 220(d)(3)(A)(i) of the National Housing Act to require that the class of persons enlisting in the armed forces after September 7, 1980 or entering active duty after October 16, 1981 have their veteran eligibility determined in accordance with Title 38, section 3103A(d) of the United States Code.