UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROBERT BENNETT, *et al.*, ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 11-0498 (ESH) |
| SHAUN DONOVAN ) Secretary, Housing and Urban Development ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiffs have sued the Secretary of the Department of Housing and Urban Development ("Secretary") in his official capacity, alleging that certain regulations that implement the Home Equity Conversion Mortgage ("HECM") program violate the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et seq.* Although plaintiffs originally brought four claims against the Secretary, the parties agree that three of the claims are now moot, so these counts have been withdrawn without prejudice. (Def.'s Combined Mem. in Support of his Mot. to Dismiss and in Opp. To Pls.' Mot. for Prelim. Inj. ("Def.'s Mot.") at 14; Pls.' Mem. in Opp. to Def.'s Mot. ("Pls.' Opp'n") at 3-4.) Plaintiffs' surviving claim alleges that the Secretary has acted contrary to law by failing to protect the spouses of holders of HECMs from foreclosure. (Compl. ¶¶ 148-57.) The Secretary now moves to dismiss, arguing that plaintiffs' claim should be dismissed under Fed. R. Civ. P. 12(b)(1) because plaintiffs lack standing. The Secretary moves, in the alternative, to dismiss plaintiffs' claim under Fed. R. Civ. P. 12(b)(6) because his interpretation of the statute is both in accordance with the unambiguously expressed intent of Congress and

based on a permissible construction of the statute. For the following reasons, the Court grants the Secretary's motion to dismiss for lack of jurisdiction.

## STATUTORY AND REGULATORY FRAMEWORK

An HECM, or a "reverse mortgage," is a mortgage that provides "future payments to the homeowner" from a "housing creditor," "based on accumulated equity" held by the homeowner. 12 U.S.C. § 1715z-20(b). The HECM program is designed to "authorize the Secretary to carry out a program of *mortgage insurance*" to "meet the special needs of elderly homeowners," 12 U.S.C. § 1715z-20(a) (emphasis added), and was authorized by Congress as part of the Housing and Community Development Act of 1987. Pub. L. No. 100-242, 101 Stat. 1815, 1908 (1988). Unlike a traditional mortgage, an HECM pays the proceeds of the loan to the mortgagor over an "extended period," while the mortgagor repays the mortgagee in a single payment at the end of a set period of time or after certain qualifying events have occured.[1] 53 Fed. Reg. 43,156 (Oct. 25, 1988). Payments are made to the mortgagor via a lump sum payment, monthly payments, or a line of credit. (Def.'s Mot. at 2; *see also* 12 U.S.C. § 1715z-20(d)(9).) A mortgage that is insured under this program must provide that the "homeowner" shall not be liable for the difference in "remaining indebtedness of the homeowner under the mortgage and the amount recovered by the mortgagee from (A) the net sales proceeds from the dwelling that are subject to the mortgage" or "(B) the insurance benefits paid" to the mortgagee pursuant to the statute. *Id.* § 1715z-20(d)(7). Thus, a mortgagee may not recover the balance of a loan by suing a mortgagor, obtaining a deficiency judgment, and/or attaching her other assets. (*See* Def.'s Mot. at 2.) As a result, the "collateral risk of a home equity conversion mortgage" is "greatest in the out years

---

[1] In a traditional mortgage, the mortgagee (or lender) provides a lump sum to the mortgagor (or borrower), who uses the money to buy a piece of property. The mortgagor then repays the mortgagee the principal and interest over an extended period of time.

because the loan balance continues to grow as long as the mortgagor occupies the property," and the possibility of loss "becomes quite high" if the "mortgagor occup[ies] the property for many years beyond his or her normal life expectancy at loan origination." 53 Fed. Reg. 43,161 (Oct. 25, 1988). To mitigate against this risk, and to "encourage and increase the involvement of mortgagees and participants in the mortgage markets," the HECM statute permits the Secretary to insure HECMs that meet the eligibility requirements. *See* 12 U.S.C. §§ 1715z-20(a), (d), (j).

The statute uses various terms to refer to borrowers and lenders, including "homeowner," "elderly homeowner," "mortgagor," and "mortgagee." The terms "'elderly homeowner' and 'homeowner' mean any homeowner who is, or whose spouse is, at least 62 years of age or such higher age as the Secretary may prescribe."[2] *Id.* § 1715z-20(b)(1). The HECM statute adopts the definitions of "mortgagee" and "mortgagor" contained in 12 U.S.C. § 1707. *Id.* § 1715z-20(b)(2). Thus, the term "mortgagee" includes "the original lender under a mortgage, and his successors and assigns approved by the Secretary," and "mortgagor" includes the "original borrower under a mortgage and his successors and assigns." *Id.* § 1707(b). A mortgagor must "qualif[y] as an elderly homeowner" and must receive "adequate counseling . . . by an independent third party" to be eligible for an HECM. *Id.* § 1715z-20(d)(2).

The statute also prevents the Secretary from insuring mortgages that do not protect homeowners for as long as they live in and own their home:

> The Secretary may not insure a home equity conversion mortgage under this section unless such mortgage provides that the homeowner's obligation to satisfy the loan obligation is deferred until the homeowner's death, the sale of the home, or the occurrence of other events specified in regulations of the Secretary. For purposes of this subsection, the term "homeowner" includes the spouse of a homeowner.

---

[2] While this subsection could be read to mean that only one "elderly homeowner" must meet the minimum age to qualify for an HECM, the Secretary has promulgated regulations that require the "youngest mortgagor" to be "62 years of age or older at the time the mortgagee submits the application for insurance." 24 C.F.R. § 206.33.

*Id.* § 1715z-20(j) ("subsection (j)").  The Secretary has implemented this statutory command with the following regulation:

> (1) The mortgage shall state that the mortgage balance will be due and payable in full if *a mortgagor* dies and the property is not the principal residence of at least one surviving *mortgagor*, or a mortgagor conveys all or his or her title in the property and no other mortgagor retains title to the property.

24 C.F.R. § 206.27(c) (emphasis added).  Once the loan becomes due, the mortgagee "shall require" the mortgagor to "pay the mortgage balance, including" interest, "sell the property for at least 95% of the appraised value . . . with the net proceeds of the sale to be applied towards the mortgage balance," or provide the mortgagee with the deed to the property.  24 C.F.R. § 206.125(a)(2).  The mortgagor has thirty days after receiving notice from the mortgagee to pay the balance before the mortgagee may begin foreclosure proceedings.  *Id.*

## FACTUAL AND PROCEDURAL HISTORY

Each of the three plaintiffs is a widowed spouse of an HECM mortgagor.  (Compl. ¶¶ 59-64, 84-94, 107-116.)  Plaintiffs, however, were neither listed on the deeds to their homes nor on the HECMs that their spouses had signed.  (*Id.* ¶¶ 61, 92, 114.)  The Secretary points out (Def.'s Mot. at 10), and plaintiffs do not contest (*see* Pls.' Opp'n at 9), that the mortgages on plaintiffs' homes contain the following language, taken from the HECM form contract: "9.Grounds for Acceleration of Debt. (a) Due and Payable.  Lender may require immediate payment in full of all sums secured by this Security Instrument if: (i) A Borrower dies and the Property is not the principal residence of at least one surviving borrower."  (*See* Compl. Ex. 6.)

Thus, per the contract language in the HECMs that had been signed by plaintiffs' spouses, and per 24 C.F.R. § 206.27, the HECMs on plaintiffs' homes became due upon their spouses' deaths, because the only borrower/mortgagor listed on each instrument was deceased.

(*Id.* ¶¶ 66, 97, 118.)  Plaintiffs allege that, as a result, they are now the subject of foreclosure actions brought by HECM mortgagees.  (*See id.* ¶¶ 74, 102, 121.)  Plaintiffs allege that HUD regulations improperly implement the anti-displacement section in subsection (j) of the HECM statute.  (*Id.* ¶ 156.)  Specifically, they argue that 24 C.F.R. § 206.27(c) illegally allows the Secretary to insure mortgages that limit protection to "surviving mortgagors," even though subsection (j) prevents the Secretary from insuring mortgages that do not protect "the spouse of a homeowner."  (*Id.* ¶¶ 148-157.)  Thus, they argue, had the Secretary properly implemented subsection (j), the reverse mortgages on their homes would not be payable and they would not be facing foreclosure.  (*Id.* ¶ 156.)

Plaintiffs originally sought both declaratory and injunctive relief in their complaint, which was filed on March 8, 2011.  (*Id.* at 1.)  On March 31, 2011, plaintiffs filed a request for a preliminary injunction.  (Mot. For Prelim. Inj. (Dkt. No. 2).)  The Secretary then filed a memorandum opposing the preliminary injunction and moving to dismiss, arguing that plaintiffs' first three causes of action were moot and that HUD had taken steps to halt the threatened bank foreclosures.  (Def.'s Mot. at 11, 14.)  Plaintiffs withdrew their motion for preliminary injunctive relief on April 12 (Dkt. No. 11), and subsequently agreed that their first three causes of action were moot.  (Pls.' Opp'n at 3-4.)  However, they continue to allege that HUD violated subsection (j) of the HECM statute, and they seek both a declaratory judgment that "HUD failed to properly implement the anti-displacement protections in the HECM statute, has illegally passed regulations that contravene this protection, and that [they] are entitled to the protections" of subsection (j), and a "permanent injunction[] prohibiting HUD from failing to accord [them] protection from displacement guaranteed to them by the HECM statute."  (Compl. at 28-29.)

5

**ANALYSIS**

**I.      STANDING**

To establish that this Court has jurisdiction to hear plaintiffs' claims, plaintiffs must show that they have standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III"). In order to satisfy the "irreducible constitutional minimum of standing," plaintiffs must demonstrate: (1) that they have suffered injury in fact, an actual or imminent invasion of a legally protected, concrete and particularized interest; (2) a causal connection between the alleged injury and the defendant's conduct at issue; and (3) that it is "likely," not "speculative," that the court can redress the injury. *Id*. at 560–61. "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff[s'] case, each element must be supported in the same way as any other matter on which the plaintiff[s] bear[] the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of litigation." *Id.* at 561.

In ruling on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a court must construe plaintiffs' complaint liberally, giving them the benefit of all favorable inferences that can be drawn from the alleged facts. *See Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004). Nonetheless, plaintiffs bear the burden of establishing subject matter jurisdiction. *Pitney Bowes, Inc. v. U.S. Postal Serv.*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998). In addition, "[w]hen a court rules on a Rule 12(b)(1) motion, it may 'undertake an independent investigation to assure itself of its own subject matter jurisdiction,'" and it may consider "facts developed in the record beyond the complaint." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (quoting *Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987)). If

"plaintiff[s'] standing does not adequately appear from all materials of record, the complaint must be dismissed." *Warth v. Seldin*, 422 U.S. 490, 502 (1975).

The Secretary does not contest that plaintiffs meet the injury-in-fact prong of the standing inquiry (Def.'s Mot. at 16; Def.'s Reply at 5), and instead advances two arguments in support of his claim that plaintiffs lack standing: (1) plaintiffs are unable to meet the causation prong of the standing inquiry because their injury—being displaced from their houses—"is the direct result of contracts entered into by Plaintiffs' spouses and private sector lenders," and not the result of any action of any party (Def.'s Reply at 5); and (2) even assuming causation, plaintiffs "advance a statutory interpretation that would not redress their injuries." (*Id.* at 9.)  The Court need not address the causation prong of standing because it finds that plaintiffs have failed to establish redressability.

### A. Redressability

Plaintiffs lack standing because the relief they seek would not redress their injuries. Redressability requires a court to find that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" on the merits. *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1992)) (quotation marks omitted). The Court must assume that it will grant the relief sought and determine whether the relief "will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996).  Relief that does not "remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).  Although causation and redressability are normally "overlapping inquiries" with "no real analytic difference," *Emergency Coal. to Defend Educ. Travel v. Dep't of Treasury*, 545 F.3d 4, 11 (D.C. Cir. 2008), "causation does not inevitably imply redressability," because there may be circumstances where "governmental action is a substantial contributing factor in bringing

7

about a specific harm, but the undoing of the governmental action will not undo the harm." *Renal Physicians Ass'n v. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1275, 1278 (D.C. Cir. 2007).

Plaintiffs' claimed injury derives from the Secretary's alleged failure to properly interpret subsection (j) and to require that HUD-insured HECMs protect the spouses, as well as the mortgagors/homeowners. (Compl. ¶ 156.) However, the actual injuries they allege are the possible displacements from their homes from pending foreclosure actions brought by the banks who hold mortgages that explicitly provide the lenders with the contractual right to foreclose. (*See, e.g.*, *id.* ¶¶ 103-106.) Where, as here, redressability "hinge[s] on the independent choices of the regulated third party," it is the "'burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to . . . permit redressability of injury." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting *Lujan*, 504 U.S. at 562). The facts alleged must be "sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought." *Renal Physicians Ass'n*, 489 F.3d at 1275.

*National Wrestling Coaches Association* is the seminal case in this Circuit on redressability where the injury to the plaintiff is the direct result of an action of an entity which is not a party to the lawsuit. In that case, organizations representing men's college wrestling coaches, athletes, and alumni challenged a regulation interpreting Title IX issued by the Department of Education. The regulation required universities to provide intercollegiate athletic opportunities to male and female students in numbers proportionate to their respective enrollments. *Id.* at 935. As a result, many colleges and universities, which were not parties to the suit, chose to eliminate their men's wrestling teams to comply with the regulation. *Id.* The

8

plaintiffs did not suggest that any particular school would restore or forego the elimination of its wrestling team in the absence of the litigation, but rather, they argued that if the regulation were repealed, they would have "better odds" of reinstating the wrestling programs. *Id.* at 939. Accordingly, plaintiffs could not establish redressability because they offered "nothing but speculation" that the "requested change in government policy [would] alter the behavior of regulated third parties that [were] the direct cause of the plaintiff's injuries." *Id.* at 938, 940. As the Circuit later explained, "the new status quo [was] held in place by other forces," making any possibility that the Court could remedy the injury too speculative. *Renal Physicians Ass'n*, 489 F.3d at 1278 (citing *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 939-40).

Crucial to the Circuit's holding was the determination that the individual choices of the colleges and universities were "truly independent of government policy." *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 941. Moreover, the Court noted that the plaintiffs had not taken the position that the injurious conduct would be "illegal in the absence of the challenged enforcement policies." *Id.* Thus, claims are redressable where providing the relief plaintiffs seek "would make the injurious conduct of third parties complained of . . . illegal," *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 811 (D.C. Cir. 1983), and where the third parties "could only preclude redress if those third parties took the extraordinary measure of continuing their injurious conduct in violation of the law." *Nat'l Wrestling Coaches*, 366 F.3d at 940-41. Thus, the Circuit found redressability where regulations allegedly permitted a third party to keep primates in inhumane conditions that would otherwise have been illegal. *Animal Legal Def. Fund, Inc. v. Glickman,* 154 F.3d 426, 428 (D.C. Cir. 1998). The plaintiffs showed that their injuries were redressable because different regulations would "necessarily alleviate" their injuries by rendering the objectionable conduct illegal. *Id.* at 443.

Recently, the Circuit has issued several opinions that suggest other ways plaintiffs may show that the relief they seek would likely redress their injuries. Plaintiffs had standing where the Attorney General's invalidation of a referendum was allegedly unconstitutional because "absent that barrier, there is no reason to believe that [the third party] would refrain from carrying out its state-law duty to put the referendum . . . into effect." *LaRoque v. Holder*, No. 10-5433, 2011 WL 2652441, at *11 (D.C. Cir. July 8, 2011). Similarly, plaintiffs in a second case showed redressability by providing a letter from the relevant third party stating that it planned to remedy the injury plaintiffs complained of "once the regulatory obstacles [were] removed." *Emergency Coal. to Defend Educ. Travel,* 545 F.3d at 11 (the Court could "imagine no reason, given the record before us," why the injury would not be remedied). In a third case, the Circuit held that a plaintiff may show redressability by showing that relief would make it in the third party's "pecuniary interest" to eliminate the alleged harm, thus rendering the "question of redressability a hardly-speculative exercise in naked capitalism." *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 135 (D.C. Cir. 2006).

In contrast to these cases, plaintiffs here cannot sustain their burden of linking the relief they seek to the injury they have suffered. Even if the Secretary has failed to require that HUD-insured HECMs include a clause protecting the spouses of homeowners, and even if the statutory interpretation plaintiffs propose will lead to third-parties protecting spouses in all *future* HUD-insured mortgages, plaintiffs "offer nothing but speculation to substantiate their assertion" that this change would affect the lenders foreclosing on their mortgages. *See Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 933. The terms of the mortgages at issue are clear: plaintiffs' spouses agreed that if the property was "not the principal residence of at least one surviving Borrower," the loans would become due. (Compl. Ex. 6.) Plaintiffs have provided nothing

beyond mere speculation to suggest that their proposed interpretation of subsection (j) could retroactively change the contractual provisions in the mortgages that their spouses agreed to. Thus, to some extent, plaintiffs' case for redressability is even weaker than the one rejected by the Circuit in *National Wrestling Coaches*, because here, plaintiffs essentially seek to stand in the shoes of future widows of insured homeowners. In fact, plaintiffs explicitly argue that they have standing because they can "achieve relief for future HECM borrowers." (Pls.' Opp'n at 7.) However, relief for spouses of future holders of HECMs is irrelevant for the purposes of redressability. *See Steel Co.*, 523 U.S. at 107 (mere "comfort and joy from the fact that . . . the Nation's laws are faithfully enforced . . . does not redress a cognizable Article III injury"); *see also Warth*, 422 U.S. at 499 (plaintiffs generally "cannot rest [their] claim[s] to relief on the legal rights or interests of third parties").

In response, plaintiffs argue that it is likely that the Secretary would order the mortgagees to provide them with relief because he exercises "powerful and pervasive influence" over the HECM program and has already temporarily postponed foreclosure on their properties. (Pls.' Opp'n at 6, 8-9.) There is no doubt that the Secretary "can influence the lenders' execution of their contractual rights and responsibilities" and that "lenders are generally willing to accede to HUD's requests to halt foreclosure" so long as HUD pays the interest on the loan in default. (Def.'s Reply at 10 & n.7.) But the Court has no doubt that the Secretary of Education could have revived some of the wrestling programs at issue in *National Wrestling Coaches* by making personal requests of university presidents. But more importantly, nothing about subsection (j), which, again, governs the types of mortgages that the Secretary may *insure*, requires the Secretary to stop mortgagees from foreclosing on plaintiffs' property. 12 U.S.C. § 1715z-20(j). In fact, plaintiffs have not argued, nor could they argue, that that their interpretation of

subsection (j) would allow HUD to void the mortgage or alter the terms of contracts between the plaintiffs and private lenders. *See United States v. Neustadt*, 366 U.S. 696, 709 & n.24 (1961) (existence of mortgage insurance program did not create a legal relationship between the government and the individual mortgagor). As the Secretary points out, whether the "mortgages were properly insured or not does not affect the mortgage's own contractual terms, and it is these terms that require Plaintiffs' spouses' estates to repay the mortgages or sell the houses." (Def.'s Mot. at 17.) Thus, plaintiffs have not explained how their interpretation of subsection (j) could possibly require the Secretary to act, and have failed to show "a substantial likelihood" that their proposed interpretation of the statute would prompt the Secretary to act to prevent foreclosure.[3] *Renal Physicians Ass'n*, 489 F.3d at 1275.

Nor have plaintiffs shown that requiring the Secretary to issue new regulations requiring any HECM insured by HUD to protect the spouse of the homeowner would indirectly redress the injuries that plaintiffs claim to have suffered. Unlike *Animal Legal Defense Fund*, it would not be illegal for the mortgagees to continue to enforce the terms of the mortgage. *See* 154 F.3d at 438. Unlike *Emergency Coalition to Defend Educational Travel*, plaintiffs have not submitted letters or affidavits from the relevant banks suggesting that they would voluntarily redress plaintiffs' injuries if the government were to reinterpret the statute. *See* 545 F.3d at 10-11 (letter from third party "strongly suggest[ed] a continuing intention . . . to resume the program once the regulatory obstacles are removed"). And unlike *Abigail Alliance for Better Access*, it is hardly in the third parties' "pecuniary interest" to grant plaintiffs relief by postponing foreclosure until some undetermined date in the future. *See* 469 F.3d at 135. Thus, plaintiffs fail to show that it is

---

[3] Plaintiffs note that the Secretary may protect the mortgagor's and the mortgagee's interests by providing funds to which they would otherwise be entitled. (Pls.' Opp'n at 6-7 n.5 (citing 12 U.S.C. § 1715z-20(i)).) This section, however, makes no mention of postponing foreclosure proceedings once a loan has come due, and thus, provides no support for plaintiffs' argument.

likely that the mortgagees would alter their behavior as a result of the relief they seek.  Indeed, there is no evidence whatsoever that it is "likely, as opposed to merely speculative," that plaintiffs' mortgages would be in any way affected by the changed eligibility requirements. *Lujan*, 504 U.S. at 561.  Plaintiffs have offered "nothing but speculation to substantiate their claim that a favorable decision from this court will redress their injuries by altering" the lenders' mortgages, *see Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 937, and therefore, they lack standing under Article III.

## CONCLUSION

For the foregoing reasons, the Court grants the Secretary's motion to dismiss.  A separate order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

DATE:  July 15, 2011