UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT BENNETT, *et al.*, | ) )  ) |
|     Plaintiffs, | ) ) |
| v. | )   Civil Action No. 11-0498 (ESH) |
| SHAUN DONOVAN<br>Secretary, Housing and Urban Development | ) ) ) ) ) |
|     Defendant. | ) ) ) |

**MEMORANDUM OPINION**

On March 8, 2011, plaintiffs sued the Secretary of the Department of Housing and Urban Development ("HUD") in his official capacity, alleging that certain regulations implementing the Home Equity Conversion Mortgage ("HECM") program violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*. Although plaintiffs originally brought four claims against HUD, the parties agree that three of the claims are now moot. Plaintiffs' sole surviving claim alleges that the Secretary acted contrary to law by failing to protect the spouses of HECM mortgagors from foreclosure. This Court previously dismissed plaintiffs' case for lack of standing. *See Bennett v. Donovan*, 797 F. Supp. 2d 69 (D.D.C. 2011). The Court of Appeals reversed. *See Bennett v. Donovan*, 703 F.3d 582 (D.C. Cir. 2013). The parties have now filed cross motions for summary judgment. (Pls.' Mot. for Summ. J. ("Pls.' Mot."); Def.'s Combined Mem. in Support of his Mot. for Summ. J. and in Opp. To Pls.' Mot. for Summ. J. ("Def.'s Mot.").) For the reasons stated below, plaintiffs' motion will be granted, and defendant's motion will be denied.

**BACKGROUND**

The material facts and statutory framework relevant to this case were described in detail in the Court's prior opinion and by the Circuit Court. *See Bennett*, 703 F.3d at 584-86; *Bennett*, 797 F. Supp. 2d. at 72-73. Therefore an abbreviated version will suffice. HECMs, often referred to as "reverse mortgages," provide a mechanism for elderly homeowners to convert "a portion of accumulated home equity into liquid assets." 12 U.S.C. § 1715z-20(a). When an elderly homeowner enters into a reverse mortgage, he receives some combination of a lump sum payment, monthly payments, or a line of credit. This non-recourse loan is secured by a mortgage on the borrower's house. Because a collateral loss may result if the value of the home is less than the outstanding balance when the loan comes due, Congress created an insurance program administered by HUD.

Plaintiffs are widowed spouses of now deceased holders of reverse mortgages insured by HUD.[1] Plaintiffs are not listed on the deeds of their homes, nor are they obligors on the reverse mortgages. *See Bennett*, 797 F. Supp. 2d. at 72-73. The reverse mortgages at issue contain language from the HECM form contract permitting the lender to demand immediate payment on the loan if the "[b]orrower dies and the [p]roperty is not the principal residence of a least one surviving borrower." *Id.* This language is consistent with 24 C.F.R. § 206.27, a regulation promulgated by HUD, which states that "[t]he mortgage shall state that the mortgage balance will be due and payable in full if a mortgagor dies and the property is not the principle residence of at least one surviving mortgagor . . . ."

---

[1] Originally, this case included three plaintiffs. Plaintiff Delores Jeanne Moore is no longer a plaintiff in this case because she purchased the property from the estate of her deceased husband. (*See* Pls.' Mot. at 5 n.5.)

Facing foreclosure, plaintiffs allege that this HUD regulation violates federal law because it does not protect them as non-mortgagor spouses. (*See* Pls.' Mot. at 10-14.)  In support of their position, plaintiffs rely on 12 U.S.C. § 1715z-20(j) ("subsection (j)") which states that

> [t]he Secretary may not insure a home equity conversion mortgage under this section unless such mortgage provides that the *homeowner's* obligation to satisfy the loan obligation is deferred until the *homeowner's* death, the sale of the home, or the occurrence of other events specified in regulations of the Secretary.  For purposes of this subsection, the term *"homeowner" includes the spouse of the homeowner.* (emphasis added).

Plaintiffs seek a declaratory judgment that HUD's regulation violates this subsection and demand that HUD be required to "take steps immediately to provide Plaintiffs the protection of Subsection (j)." (Pls.' Mot. at 15.)

## ANALYSIS

### I.   LEGAL STANDARDS

#### A. Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." However, in a case such as this one involving review of agency action under the APA, the standard set forth in Rule 56 does not apply. *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006).  Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. *See Bloch v. Powell,* 227 F. Supp. 2d 25, 31 (D.D.C. 2002), *aff'd,* 348 F.3d 1060 (D.C. Cir. 2003).

**B.** *Chevron* **Deference**

The Supreme Court's opinion in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), outlines a two-step process courts must follow in determining whether to defer to an agency's interpretation of a statute. "Under *Chevron* [s]tep [o]ne, the court applies the traditional tools of statutory construction in order to discern whether Congress has spoken directly to the question at issue." *Eagle Broad. Group, Ltd. v. FCC*, 563 F.3d 543, 552 (D.C. Cir. 2009) (citing *Chevron*, 467 U.S. at 842-43). "If this 'search for the plain meaning of the statute . . . yields a clear result, then Congress has expressed its intention as to the question, and deference is not appropriate.'" *Id.* at 552 (quoting *Bell Atlantic Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997)). Under that circumstance, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *See Chevron*, 467 U.S. at 842-43.

In order to decide a case on that basis of *Chevron* step one, a court must find that the intent of Congress evidenced in the statute is not just "plausible," but rather that it is the "only possible interpretation." *See Regions Hosp. v. Shalala*, 522 U.S. 450, 460 (1998); *PDK Laboratories, Inc. v. U.S. D.E.A.*, 362 F.3d 786, 796 (D.C. Cir. 2004) ("That a statute is susceptible of one construction does not render its meaning plain if it is also susceptible of another, plausible construction . . . ."). If the court finds that "the statute is silent or ambiguous with respect to the specific issue," the court will proceed to step two of the *Chevron* analysis and consider whether the agency's interpretation of the statute is arbitrary and capricious. *See Chevron*, 467 U.S. at 843. At this second step, the agency's interpretation is "given controlling weight unless" it is "manifestly contrary to the statute." *Id.* at 844. The question at this step "is not whether the [plaintiff's] proposed alternative is an acceptable policy option but whether the

[agency action] reflects a reasonable interpretation of [the statute]." *Coal. for Common Sense in Gov't Procurement v. United States,* 707 F.3d 311, 317 (D.C. Cir. 2013).

## II.   *CHEVRON* STEP ONE REVIEW

### A.  Plain Meaning

When analyzing a statute under *Chevron* step one, a court must first determine whether the plain meaning of the statutory text is clear on its face or whether the statutory text is ambiguous. *See PSEG Energy Resources & Trade LLC v. F.E.R.C.*, 665 F.3d 203, 208 (D.C. Cir. 2011). For purposes of *Chevron* analysis, "ambiguity is a creature not of definitional possibility but of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). Therefore, "the issue is not so much whether the [statutory language] . . . is, in some abstract sense, ambiguous, but rather whether, read in context and using the traditional tools of statutory construction, the term . . . encompasses [the government's interpretation]." *Cal. Indep. Sys. Operator Corp. v. F.E.R.C.*, 372 F.3d 395, 400 (D.C. Cir. 2004).

In this analysis, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (citation omitted). Moreover, at this step, "[courts] alone are tasked with determining Congress's unambiguous intent," and therefore the statutory interpretation proceeds "without showing the agency any special deference." *Village of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011).

Both parties agree that this case turns on whether subsection (j) is ambiguous or whether the plain meaning of the text is readily ascertainable. Plaintiffs contend that subsection (j) is capable of a single meaning; namely, that HUD may only insure reverse mortgages that come due after the death of *both* the homeowner (the mortgagor) and the spouse of that homeowner

regardless of whether that spouse is also a mortgagor. (*See* Pls.' Mot. at 10-14.)  Defendant argues that subsection (j) is ambiguous because the statute can also be read to protect only those spouses who are co-obligors on a reverse mortgage. (Def.'s Mot. at 13-20.)

This conflict arises because the parties disagree as to the meaning of the second sentence of subsection (j)—"[f]or purposes of this subsection, the term 'homeowner' includes the spouse of a homeowner."  Plaintiffs read this sentence to mean that for the purposes of subsection (j), the term homeowner includes the homeowner and *that homeowner's spouse.*  Defendant reads it to mean that for purposes of subsection (j), the term homeowner includes the homeowner and his or her *homeowner spouse*.  If either of these readings is plausible, the Court must move on to *Chevron* step two.  However, if only one is plausible, the Court "must give effect to the unambiguously expressed intent of Congress." *See Chevron*, 467 U.S. at 842-43.

In analyzing which construction of the statute is correct, the Court is aided by the longstanding canon of statutory interpretation that it must "give effect, if possible, to every clause and word of a statute, avoiding, if it may [], any construction which implies that the legislature was ignorant of the meaning of the language it employed." *Inhabitants of the Twp. of Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883); *see also Am. Airlines, Inc. v. Transp. Sec. Admin.*, 665 F.3d 170, 176 (D.C. Cir. 2011). Put differently, a court must not interpret a statute so as to render any words within that statute as "mere surplusage." *See Potter v. United States*, 155 U.S. 438, 446 (1894) (language "cannot be regarded as mere surplusage; it means something").

Relying on this hermeneutic principle, plaintiffs argue that in subsection (j) Congress intended to extend displacement protection to the homeowner and his or her spouse regardless of whether the spouse was also an obligor on the loan. (Pls.' Mot. at 12.)  Any other reading,

plaintiffs explain, would "strip[] spouses of their explicit statutory protection against displacement, and render[] the core statutory protection at issue here mere surplusage." (*Id.* at 14.) In response, defendant contends that for purposes of subsection (j), "a person must be a homeowner in order to be within the definition of a 'homeowner' under the statute." (Def.'s Mot. at 16 n.12.) "If the spouse is not a borrower on the mortgage note," defendant argues, "then the spouse has no 'obligation to satisfy the loan obligation' and there is nothing to defer until her death." (*Id.* at 14.)

Defendant's construction of the statute would render the second sentence of subsection (j) mere surplusage, so it is not a plausible reading of the statutory text. If a spouse is a co-obligor on the reverse mortgage, then he or she would automatically be considered a "homeowner" under the terms of the statute.[2] By virtue of the spouse's legal status as a homeowner, he or she would be protected by the first sentence of subsection (j), which defers the reverse mortgage from becoming due and payable "until the homeowner's death." 12 U.S.C. § 1715z-20(j). Under defendant's interpretation, therefore, the same protections would extend to the same parties—the homeowner(s)—with or without the second sentence. Because defendant's position effectively reads the second sentence of subsection (j) out of the statute, the Court finds this construction to be implausible.[3] In order for the second sentence to have any meaning at all, it must be read to include in the definition of homeowner any spouse, regardless of whether he or she is a joint mortgagor.

---

[2] According to the explicit terms of the statute, a prospective obligor must be a homeowner to be eligible for a reverse mortgage. *See* 12 U.S.C. § 1715z-20(d)(2)(A).

[3] On appeal, the Court of Appeals appears to have endorsed this conclusion in *dicta*. In his opinion for the Court, Judge Silberman wrote: "[W]e admit to being somewhat puzzled as to how HUD can justify a regulation that seems contrary to the governing statute." *Bennett*, 703 F.3d at 586. But, as defendant correctly argues, this observation by the Circuit does not bind this Court. (Def.'s Mot. at 12 (citing *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006)).)

Defendant tries to avoid this result and give meaning to subsection (j) by arguing that "[i]n the absence of the second sentence of Subsection (j), a due-on-sale clause could be triggered by the death of one joint tenant, or one member of a tenancy by the entirety."[4] (Def.'s Mot. at 18.) Yet, this interpretation is simply not supported by the statute. Although the word "mortgagor" does appear at least twenty times in the statute, Congress specifically chose to use the term "spouse" in subsection (j), and not "joint mortgagors" or "joint tenants." In fact, Congress chose "spouse" notwithstanding the fact that it has a very specific meaning, and notwithstanding the fact that in other sections of the statute, Congress demonstrated its ability to extend protections to joint mortgagors with ease. In subsection (f), for example, Congress requires HUD to extend counseling services not to homeowners and their spouses, but to "each mortgagor." 12 U.S.C. § 1715z-20(f). The Court presumes, therefore, that if Congress wanted to extend displacement protection to joint mortgagors, the second sentence of subsection (j) would have read: "For purposes of this subsection, the term 'homeowner' includes each mortgagor."

Moreover, as discussed above, it is clear that the first sentence of subsection (j) would be sufficient to protect two co-mortgagor spouses without the inclusion of the second sentence. Defendant's argument regarding due-on-sale clauses does nothing to alter this analysis. The first sentence of subsection (j) is sufficient to protect against the scenario proffered by defendant

---

[4] In support of this argument, defendant relies in part on the "regulatory background" at the time of subsection (j)'s passage. (Def.'s Mot. at 17.) Specifically, defendant emphasizes that pursuant to another act of Congress, the Garn St. Germain Act, "Congress created a number of exceptions to the enforceability of due-on-sale clauses," but excluded reverse mortgages from that protection. (*See id.*) Evidence of other statutes, however, is appropriate at step two of *Chevron* analysis, not at step one. *See, e.g.*, *Kennecott Utah Copper Corp. v. U.S. Dept. of Interior*, 88 F.3d 1191, 1231 (D.C. Cir. 1996). Moreover, even if the Court were to consider the Garn St. Germain Act, it would not be swayed by defendant's argument that because the Act did not protect reverse mortgages, it follows that subsection (j) was passed *only* to close that statutory gap. Defendant simply presents no evidence that subsection (j) was passed specifically to address this aspect of HECM lending. (*See* Def.'s Mot. at 18.)

where a lender seeks to invoke a due-on-sale clause after the death of the first obligor spouse, because *both* borrowers would be "homeowners" under the statute. The second part of the first sentence would protect the widowed co-mortgagor because a "homeowner" would still be alive.

In addition to offering his own interpretation of the statute, defendant argues that plaintiffs' reading of the statute is implausible. "Although the term 'homeowner' appears twice in the first sentence of Subsection (j)," defendant asserts, "Plaintiffs attempt to substitute the term 'spouse' for only one of those." (Def.'s Mot. at 15-16.) Under this reasoning, defendant contends that plaintiffs "would rewrite the statute to read: The Secretary may not insure a home equity conversion mortgage under this section unless such mortgage provides that the *homeowner's* obligation to satisfy the loan obligation is deferred until the *spouse's* death . . . ." (*Id.* (emphasis in original).) Defendant argues that the only way to judge the validity of plaintiffs' proposed construction is to read the sentence in the following way: The Secretary may not insure a home equity conversion mortgage under this section unless such mortgage provides that the *spouse's* obligation to satisfy the loan obligation is deferred until the *spouse's* death. (*Id.* at 16.)

The problem with defendant's argument is that if the statute is read in this way, it fundamentally misconstrues the definition of the term "includes." Because "[a] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning," *Perrin v. United States*, 444 U.S. 37, 42 (1979); *Rasul v. Myers*, 563 F.3d 527, 533 (D.C. Cir. 2009) (quoting *Perrin*, 444 U.S. at 42), it is more appropriate to read the second sentence of subsection (j) in light of the common meaning of "include": "to take in or comprise as a part of a whole." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 588 (10th ed. 1997). This is very different from the definition of the word

9

"substitute," which means "to put or use in the place of another." *Id.* at 1174. Relying on these dictionary definitions, the Court concludes that Congress intended to give "homeowner" a more-expansive meaning in subsection (j) when it used the word "includes"—a meaning where it takes in, or encompasses, the word "spouse." To require the Court to *substitute* the term spouse for all references to homeowner in its analysis would effectively eliminate Congress' use of the term "include."[5]

Ultimately, while the plain text of this statute may lack "linguistic precision, there is no reason to manufacture ambiguity when, as in this case, the legislative prose is pellucid." *See Performance Coal Co. v. Fed. Mine & Health Review Comm'n*, 642 F.3d 234, 239 (D.C. Cir. 2011). Neither party asserts that this is a case where Congress failed to consider the precise question at hand or where Congress explicitly left a gap for an administrative agency to fill. Rather, this is a case in which the parties disagree as to the implications of Congress' definition of "homeowner" for the narrow purposes of subsection (j). Despite his linguistic gymnastics, the plain meaning of the statute "unambiguously forecloses" defendant's interpretation. *See Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012). Subsection (j) means what it says: the loan obligation is deferred until the homeowner's *and* the spouse's death. Therefore, the judicial inquiry stops there.

### B. Context and Legislative History

In this Circuit, a court must "exhaust the traditional tools of statutory construction . . . [including] the statute's text, legislative history, and structure, as well as its purpose" at step one

---

[5] This reasoning also illustrates why defendant's focus on defining the term "obligation" is misguided. (*See* Def.'s Mot. at 14-16.) Both parties agree that the term "obligation" extends just to "the homeowner." The question in this case is whether the phrase "homeowner's obligation" implies an obligation of any member of the category homeowner (which includes a non-obligor spouse) or whether both the "homeowner" and the spouse must independently be obligors in order to be protected under subsection (j).

of its *Chevron* analysis. *See id.* (quoting *Bell Atl. Tel. Cos.*, 131 F.3d at 1047). That said, in order "to defeat application of a statute's plain meaning, [defendant] must show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it." *Performance Coal Co.*, 642 F.3d. at 238 (quoting *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996) (internal quotation marks omitted)).

      While the Court is satisfied that the statutory text of subsection (j) is unambiguous for the reasons discussed above, there are several contextual arguments which offer further support for the Court's conclusion. First among these is that the second sentence of subsection (j) begins with the introductory clause, "For purposes of this subsection . . . ." This preamble is indicative of Congress' intent that the sentence serve a special function. Indeed, subsection (j) is the only subsection in the entire HECM statute that includes such qualifying language, and "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citations and internal quotation marks omitted). In addition, the Court also presumes that Congress' use of the word "spouse" was intentional; after all, the only other time it appears in the statute is when Congress defined "elderly homeowner" to mean "any homeowner who is, or whose spouse is, at least 62 years of age or such higher age as the Secretary may prescribe." 12 U.S.C. 1715z-20(b). Read in tandem, subjections (b) and (j) confirm that Congress drafted the statute with an understanding that spouses could be distinct from homeowners, and that scenarios might arise where reverse mortgages would be entered into by only one of two spouses but still affect the non-mortgagor spouse.

The Court also finds instructive the Senate Report of the Committee on Banking, Housing and Urban Affairs where subsection (j) is discussed.[6] *See* S. Rep. No. 100-21, at 28 (1987). This report explicitly states that subsection (j) intended to "defer[] any repayment obligation until *death of the homeowner and the homeowner's spouse . . .*" *Id.* Defendants do not dispute the existence of this legislative history, nor could they. Instead, they argue that the committee report is an "unreliable guide, particularly [when compared] with the language of the conference report." (Def.'s Mot. at 27.) Yet, defendant fails to point to any language in the Conference Report that specifically addresses the question presented in this case. (*See id.* (quoting H.R. Rep. No. 100-426, *reprinted in* 1987 U.S.C.C.A.N. 3458, 3512).) To the contrary, defendant states that "[m]ore than anything, th[e] legislative history indicates Congress' intent to confer upon the Secretary the broad discretion necessary to operate the HECM insurance program in a financially responsible manner." (Def.'s Mot. at 27.) It is indisputable that Congress, as it so often does, sought to provide the agency with broad discretion in effectuating a statutory scheme. However, under *Chevron* it is the duty of the court to determine whether the regulations that the agency adopted pursuant to that scheme violate the plain text of the statute. On this question, the Conference Report's reference to broad discretion is simply not helpful. Therefore, while defendant is correct that as a general matter a conference report is a better indicator of congressional intent than an unpublished committee report, where—as in this case—the conference report fails to shed light on the statutory text, the Court finds it useful to look at legislative history that is directly on point.

---

[6] Legislative history is of limited value at step one of the *Chevron* inquiry, especially when a court concludes that the statute's plain meaning is clear. *See Halverson v. Slater*, 129 F.3d 180, 189 n.10 (D.C. Cir. 1997) ("[O]rdinarily we have no need to refer to legislative history at *Chevron* step one . . . . We consider legislative history [] only because the Secretary argues it evinces a congressional intent at odds with what the language of [the statute] otherwise manifests.") .

Defendant's pleadings make several additional arguments, including the need to create an actuarially sound reverse mortgage insurance plan, the Equal Credit Opportunity Act, the Garn St. Germain Act, congressional acquiescence, and state intestacy issues. However, as defendant recognizes, none of these arguments speaks to whether the statutory text is unambiguous. Instead, they only speak to the question of whether the regulation at issue is an arbitrary and capricious exercise of HUD's statutorily granted authority. Because the Court is satisfied based on the plain meaning of the text, as well as the context and legislative history, that there is only one plausible construction of subsection (j), it is not permitted to continue to *Chevron* step two and consider these extra-textual sources.

### C. "Other Events" Clause

In a final attempt to justify the validity of HUD's regulation, defendant argues that HUD's ability under subsection (j) to specify "other events" when a reverse mortgage can become due allows it to "make the death of all *borrowers* a triggering event." (Def.'s Mot. at 20 (emphasis in original).) However, this argument is without merit. Simply because subsection (j) permits HUD to create "other events" when a lender may make a reverse mortgage due, it does not give HUD the statutory authority to alter the specific triggering events identified in the statute. *See Nat'l Treasury Emples. Union v. Chertoff*, 452 F.3d 839, 858-59 (an agency may not "nullify the [statute's] specific guarantee . . ."); *Railway Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 670 (D.C. Cir. 1994) (an agency does not have "plenary" authority to act, just because Congress provides "some" authority). Defendant's reading of subsection (j) would do just that. It would permit the agency to unilaterally create a triggering event that would render another statutorily-specified triggering event ("the homeowner's death") meaningless. Therefore, it is not a plausible reading of the statute.

## III.     REMEDY

Having found that subsection (j) is not ambiguous and that HUD's regulation as applied to plaintiffs is invalid,[7] the Court is now tasked with identifying the appropriate remedy. In this regard, the Court is bound by the explicit guidance set forth by the Court of Appeals:

> We do not hold, of course, that HUD is *required* to take [a] precise series of steps, nor do we suggest that the district court should issue an injunction to that effect. Appellants brought a complaint under the Administrative Procedure Act to set aside an unlawful agency action, and in such circumstances, it is the prerogative of the agency to decide in the first instance how best to provide relief. *See N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) . . .
>
> Perhaps HUD would provide the precise relief we have outlined, perhaps it would find another alternative, or perhaps it would decide no such relief was appropriate. We recognize that, even if the district court issues a declaratory judgment, appellants still have no *guaranty* of relief. Though of course, if Bennett and Joseph prevailed on the merits in the district court but were dissatisfied with HUD's remedy, they would always have the option to seek review on the ground that HUD's actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' 5 U.S.C. § 706(2)(A).

*Bennett,* 703 F.3d at 589.

Given this guidance, this Court has no choice but to "identify the legal error" and then "remand to the agency." *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012). That error is that HUD violated 12 U.S.C § 1715z-20(j) when it insured the reverse mortgages of plaintiffs' spouses pursuant to agency regulation, which permitted their loan obligations to come due upon their death regardless of whether their spouses (plaintiffs) were still alive. The Court will remand the case to HUD so that it can fashion appropriate relief consistent with this Memorandum Opinion.

---

[7] There is some disagreement as to whether this challenge is "facial" or "as applied." However, both parties seem to reach the conclusion that this challenge only applies to the plaintiffs in this case. (*See* Pls.' Mem. of Law in Further Support of Their Mot. for Summ. J. and in Response to Def.'s Mot. for Summ. J. at 17 ("the Court should issue a declaratory judgment that the challenged regulations are invalid as applied to Plaintiffs . . . ."); Def.'s Mot. at 34 ("At best, Plaintiffs can argue that [the regulations] are invalid as applied to them . . . .").)

## CONCLUSION

For the foregoing reasons, the Court grants the plaintiffs' motion for summary judgment and denies defendant's cross motion for summary judgment. A separate order accompanies this Memorandum Opinion.

>                    /s/
> ELLEN SEGAL HUVELLE
> United States District Judge

DATE:  September 30, 2013