## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ROBERT BENNETT,** *et al.*, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Civil Action No. 11-0498 (ESH)** |
| | ) |
| **JULIÁN CASTRO, in his official capacity as** | ) |
| **SECRETARY OF THE DEPARTMENT** | ) |
| **OF HOUSING AND URBAN DEVELOPMENT** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Robert Bennett and Leila Joseph have moved for an award of attorney's fees, costs, and expenses pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. Plaintiffs originally brought suit in 2011 against the Secretary of the Department of Housing and Urban Development ("HUD") in his official capacity, alleging that the agency's implementation of the Home Equity Conversion Mortgage ("HECM") program violated the Administrative Procedure Act, 5 U.S.C. § 551, *et seq*. This Court initially dismissed the case for lack of standing in *Bennett v. Donovan* ("*Bennett I*"), 797 F. Supp. 2d 69 (D.D.C. 2011). The Court of Appeals reversed. *See Bennett v. Donovan*, 703 F.3d 582 (D.C. Cir. 2013).

This Court, on remand, granted summary judgment to plaintiffs. *See Bennett v. Donovan* ("*Bennett II*"), 4 F. Supp. 3d 5 (D.D.C. 2013). It found that HUD's regulations violated the unambiguous text of the implementing statute by authorizing the agency to insure HECMs that became due and payable upon the death of a mortgagor who was survived by a non-borrowing spouse. *See id.* at 14-15. Following the instructions of the Court of Appeals, this Court remanded to the agency to fashion appropriate relief. *See id.* at 15.

Plaintiffs now assert that, in light of this Court's decision in *Bennett II*, they are prevailing parties and that the government's position was not substantially justified.  (Pls.' Mot. for Attorneys' Fees, Costs, and Expenses [ECF No. 51] ("Pls.' Mot.").)  Plaintiffs therefore request a total award of $293,932.40.  (*Id.* at 2.)  For the reasons stated below, plaintiffs' motion will be granted in part and denied in part, and plaintiffs will be awarded $236,112.89.

## BACKGROUND

The background of this case has been described by this Court and the Court of Appeals. *See Bennett*, 703 F.3d at 584-86; *Plunkett v. Castro*, No. 14-cv-326, 2014 U.S. Dist. LEXIS 119805, at *3-15 (D.D.C. Aug. 28, 2014); *Bennett II*, 4 F. Supp. 3d at 7-8; *Bennett I*, 797 F. Supp. 2d at 71-73.  The Court will therefore confine its discussion to the facts and statutory framework relevant to the instant motion.

HECMs, which are colloquially referred to as "reverse mortgages," allow homeowners to convert "a portion of accumulated home equity into liquid assets."  12 U.S.C. § 1715z-20(a)(1). A borrower who takes out an HECM loan may receive some combination of a lump sum payment, monthly payments, or a line of credit.  *See id.* § 1715z-20(d)(9).  Unlike a traditional mortgage, an HECM loan is generally not repaid until a specific "trigger" event occurs; for example, the death of the borrower or the sale of the home.  *See id.* § 1715z-20(j); 24 C.F.R. § 206.27(c)(1).  This arrangement is particularly favorable for the borrower because HECM loans are generally nonrecourse – that is, they are secured only by the home.  12 U.S.C. § 1715z-20(d)(3).  If the value of the home is less than the amount of the loan when the trigger event occurs and the loan comes due, the lender has no recourse to the borrower's other assets.  Since the loan balance increases over time as interest accumulates, lenders can face a major loss if the borrower lives longer than expected.

In order to mitigate this risk and encourage lenders to provide elderly homeowners with HECM loans, Congress authorized HUD to insure HECMs that meet certain eligibility requirements.  *See* 12 U.S.C. § 1715z-20(a), (d), (j).  The particular provision at issue in the underlying litigation states:

> The Secretary may not insure a home equity conversion mortgage under this section unless such mortgage provides that the homeowner's obligation to satisfy the loan obligation is deferred until the homeowner's death, the sale of the home, or the occurrence of other events specified in regulations of the Secretary.  For purposes of this subsection, the term "homeowner" includes the spouse of a homeowner.

12 U.S.C. § 1715z-20(j).  In implementing the statute, HUD issued the following regulation concerning when HECM loans become due and payable:

> The mortgage shall state that the mortgage balance will be due and payable in full if a mortgagor dies and the property is not the principal residence of at least one surviving mortgagor, or a mortgagor conveys all or his or her title in the property and no other mortgagor retains title to the property.  For purposes of the preceding sentence, a mortgagor retains title in the property if the mortgagor continues to hold title to any part of the property in fee simple, as a leasehold interest as set forth in § 206.45(a), or as a life estate.

24 C.F.R. § 206.27(c)(1).

Plaintiffs are widowed spouses of holders of HECMs insured by HUD.  *Bennett II*, 4 F. Supp. 3d at 7-8.  Plaintiffs were neither listed on the deeds to their spouses' homes nor on the HECMs that their spouses had signed.  *Bennett I*, 797 F. Supp. 2d at 73.  Consistent with 24 C.F.R. § 206.27(c), the HECM loans became due and payable upon the death of the mortgagors, *i.e.*, plaintiffs' spouses.  *Id.*  Facing foreclosure, plaintiffs brought suit, alleging that HUD's regulations violated federal law by failing to protect non-mortgagor spouses as required by 12 U.S.C. § 1715z-20(j).

In their motion for summary judgment, plaintiffs contended that 12 U.S.C. § 1715z-20(j) was "capable of a single meaning: namely, that HUD may only insure reverse mortgages that

come due after the death of *both* the homeowner (the mortgagor) and the spouse of that homeowner regardless of whether that spouse is also a mortgagor." *Bennett II*, 4 F. Supp. 3d at 9. Defendant responded that subsection (j) was "ambiguous because the statute can also be read to protect only those spouses who are co-obligors on a reverse mortgage." *Id.* at 9-10.

The Court found that defendant's interpretation of the statute "would render the second sentence of subsection (j) mere surplusage" because, if a spouse was a co-obligor on a reverse mortgage, "he or she would automatically be considered a 'homeowner' under the terms of the statute.'" *Id.* at 10. The Court pointed out that Congress used the phrase "each mortgagor" in another subsection of the same statute and could have used similar language in subsection (j) had it intended to convey the meaning suggested by defendant. *Id.* at 11.

The Court also noted that the statute's legislative history supported plaintiffs' interpretation. In particular, a report by the Committee on Banking, Housing and Urban Affairs stated that subsection (j) was "intended to 'defer[] any repayment obligation until *death of the homeowner and the homeowner's spouse . . . .*" *Id.* at 13 (alterations in original) (quoting S. Rep. No. 100-21, at 28 (1987)). Defendant's only response was to cite a Conference Report discussing HUD's discretion in implementing the HECM program, but defendant "fail[ed] to point to any language in the Conference Report that specifically address[ed] the question presented in [the] case." *Id.*

The only other pertinent argument put forward by defendant was that HUD could, under the "other events" clause of subsection (j), "make the death of all *borrowers* a triggering event." *Id.* at 14 (quoting Def.'s Combined Mem. in Supp. of his Mot. for Summ. J. and Opp. to Pls.' Mot. for Summ J. [ECF No. 33] ("Def.'s MSJ") at 20.) This Court found that argument "without

merit" since it would "render another statutorily-specified triggering event ('the homeowner's death') meaningless."  *Id.*

The Court granted summary judgment to plaintiffs, concluding that 12 U.S.C. § 1715z-20(j)'s meaning was unambiguous under *Chevron* step one.  *See id.* at 12 ("[The statute] means what it says: the loan obligation is deferred until the homeowner's *and* the spouse's death.").  The Court held that "HUD's regulation as applied to plaintiffs is invalid."  *Id.* at 14.  Following the guidance provided by the Court of Appeals, this Court remanded to the agency "so that it [could] fashion appropriate relief."  *Id.* at 15.

Plaintiffs now argue that, pursuant to the EAJA, they are entitled to $293,932.40 in attorney's fees, costs, and expenses.  (Pls.' Mot. at 1.)  The EAJA provides, in relevant part, that "a court shall award to a prevailing party . . .  fees and other expenses . . . incurred by that party in any civil action . . . , including proceedings for judicial review of agency action, brought by or against the United States . . . , unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust."  28 U.S.C. § 2412(d)(1)(A).  Plaintiffs contend that they are prevailing parties and that the government's position was not substantially justified.  Defendant disagrees, and, in the alternative, it challenges the amount of plaintiffs' requested award.  The Court will address these issues in turn.

## ANALYSIS

## I.  PREVAILING PARTY

The D.C. Circuit has articulated a three-part test for determining whether a party has prevailed for purposes of fee-shifting statutes: "(1) there must be a 'court-ordered change in the legal relationship' of the parties; (2) the judgment must be in favor of the party seeking the fees; and (3) the judicial pronouncement must be accompanied by judicial relief."  *District of*

*Columbia v. Straus*, 590 F.3d 898, 901 (D.C. Cir. 2010) (quoting *Thomas v. NSF*, 330 F.3d 486, 492-93 (D.C. Cir. 2003)).  A "mere 'judicial pronouncement,' . . . unaccompanied by '*judicial relief*,' is not sufficient to make a claimant a 'prevailing party.'"  *Thomas*, 330 F.3d at 494 (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 606 (2001)).

Defendant contends that plaintiffs are not prevailing parties because they obtained only "a remand . . . with instructions to consider their request for relief in light of the Court's holding," but "have not yet received any concrete real-world relief."  (Def.'s Opp. to Pls.' Mot. for Attorney's Fees, Costs, and Expenses [ECF No. 56] ("Def.'s Opp.") at 4.)  Defendant argues that this Court "did not invalidate HUD's regulation" or "issue any type of injunctive relief," and quoting the Court of Appeals, defendant maintains that this Court's ruling did not provide plaintiffs with any "*guaranty* of relief."  (*Id.* at 4-5 (quoting *Bennett*, 703 F.3d at 589).)

Defendant's arguments are unavailing.  In *Bennett II*, this Court made clear that "HUD's regulation [24 C.F.R. § 206.27(c)(1)] as applied to plaintiffs is invalid."  4 F. Supp. 3d at 14. After this Court issued *Bennett II*, four non-borrowing spouses, not parties to the *Bennett* litigation, filed a new lawsuit on behalf of themselves and a purported class of similarly situated individuals, which lodged the identical challenge made by the *Bennett* plaintiffs against HUD's regulations.  *Plunkett*, 2014 U.S. Dist. LEXIS 119805, at *9.  During summary judgment briefing in *Plunkett*, defendant acknowledged that "the effect of the Court's decision [in *Bennett II*] and statements invalidating the application of 24 C.F.R. § 206.27(c)(1) to plaintiffs is that 24 C.F.R. § 206.125 is not triggered as a result of their spouses' deaths."[1]  (Mem. in Supp. of Def.'s

---

[1] 24 C.F.R. § 206.125 requires the mortgagee to notify HUD when a mortgage becomes due and payable under 24 C.F.R. § 206.27(c)(1).  After notifying HUD, the mortgagee can notify the mortgagor, and if the mortgagor does not satisfy the loan or cure the defect that caused the

Mot. to Dismiss or, in the Alternative, for Summ. J. [ECF No. 37-1] ("Def.'s *Plunkett* MSJ") at 2.)  Defendant further conceded that, as a consequence of 24 C.F.R. § 206.125 not being triggered by plaintiffs' spouses' deaths, "the mortgagees may hold plaintiffs' spouses' mortgages unless and until some other event of default occurs."  (Def.'s Reply in Further Supp. of his Mot. to Dismiss or, in the Alternative, for Summ. J. [ECF No. 44] at 4.)  Defendant has stood by this interpretation and has recently outlined the process by which plaintiffs' spouses' mortgagees may hold the mortgages notwithstanding the deaths of plaintiffs' spouses.  (*See* Proposed Letter [ECF No. 52-1].)

        In light of defendant's concessions regarding the effect of *Bennett II*, this Court has little trouble concluding that plaintiffs prevailed in the underlying litigation.  Indeed, plaintiffs succeeded completely on the merits and received much of what they sought in bringing the lawsuit.  This Court invalidated 24 C.F.R. § 206.27(c)(1) as applied to plaintiffs, and as a result, HUD determined that it may no longer require banks to foreclose on plaintiffs solely as a result of the deaths of their mortgagor spouses.  (*See* Def.'s *Plunkett* MSJ at 2, 23-24.)  *Bennett II*, therefore, yielded a "change in someone's primary conduct in the real world."  *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 966 (D.C. Cir. 2004) (quoting *Waterman S.S. Corp. v. Maritime Subsidy Bd.*, 901 F.2d 1119, 1122 (D.C. Cir. 1990)).  The mere fact that this Court remanded to HUD to fashion appropriate relief does not change the fact that there has been a substantial, court-ordered change in the legal relationship between the parties.  *See e.g.*, *Role Models Am.*, 353 F.3d at 966 (finding prevailing party status where a remand was accompanied by an injunction); *Envt'l Defense Fund, Inc. v. Reilly*, 1 F.3d 1254, 1257 (D.C. Cir. 1993)

_____

mortgage to become due and payable within 30 days, the mortgagee may foreclose on the home. 24 C.F.R. § 206.125(a)(2).

(finding prevailing party status where a remand was accompanied by the vacatur of the challenged regulation).

## II.     SUBSTANTIALLY JUSTIFIED

"Once an applicant's status as a prevailing party is established, the government has the burden of showing that its legal position was substantially justified or that special circumstances make an award unjust." *Taucher v. Brown-Hruska*, 396 F.3d 1168, 1173 (D.C. Cir. 2005). The government's position "includ[es] both the underlying agency action and the arguments defending that action in court." *Halverson v. Slater*, 206 F.3d 1205, 1208 (D.C. Cir. 2000). "'Substantially justified' means 'justified in substance or in the main – that is, justified to a degree that could satisfy a reasonable person. That is no different from . . . [having] a reasonable basis both in law and fact.'" *Id.* (alterations in original) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). A loss at *Chevron* step one does not, however, automatically mean that the government's position was not substantially justified. *See id.* at 1211 ("While this *Chevron* case turned out to be quite easy, other *Chevron* step one cases have presented quite difficult issues and involved 'substantially justified' arguments on both sides.") Ultimately, the responsibility of this Court is to "analyze *why* the government's position failed in court." *Taucher*, 396 F.3d at 1174.

As an initial matter, defendant argues that this Court should evaluate separately the reasonableness of its standing arguments and its position on the merits. (Def.'s Opp. at 7 ("Separate substantial justification determinations may be made for different defenses or different stages within one civil action.").) Defendant relies primarily on *Cinciarelli v. Reagan*, 729 F.2d 801 (D.C. Cir. 1984), in which the D.C. Circuit considered two independent, substantive defenses separately. *See id.* at 804-05. As plaintiffs correctly point out, however,

subsequent Supreme Court precedent has cast doubt on the continuing vitality of *Cinciarelli*. (Pls.' Reply Mem. in Further Supp. of Their Mot. for Attorneys' Fees, Costs, and Expenses [ECF No. 57] ("Pls.' Reply") at 8-11.)  In *Commissioner, INS v. Jean*, 496 U.S. 154 (1990), the government argued that the district court should evaluate separately the reasonableness of its position on the merits and with respect to the recovery of attorney's fees. *Id.* at 157. Emphasizing that the statute repeatedly references "the position of the United States" in the singular, the Court rejected the government's argument and held that "only one threshold determination for the entire civil action is to be made."  *Id.* at 159; *see also id.* at 161-62 ("Any given civil action can have numerous phases.  While the parties' postures on individual matters may be more or less justified, the EAJA – like other fee-shifting statutes – favors treating a case as an inclusive whole, rather than as atomized line-items.").  This "threshold determination" "encompass[es] both the agency's prelitigation conduct and the Department of Justice's subsequent litigation position."  *Id.* at 159.

Defendant cites several post-*Jean* cases that suggest that separate substantial justification determinations may still be appropriate.  Most notably, in *American Wrecking Corp. v. Secretary of Labor*, 364 F.3d 321 (D.C. Cir. 2004) (*per curiam*), the D.C. Circuit, in considering an EAJA fee petition, stated: "Our analysis proceeds in a piecemeal fashion, examining the reasonableness of the Secretary's position at each successive phase of the proceeding on each separate issue, both at the agency level and before this court."  *Id.* at 325-26.  This statement stands in stark contrast with *Jean*, which explicitly rejected the government's contention that "it may assert a 'substantial justification' defense at multiple stages of an action."  496 U.S. at 158-59.  *American Wrecking Corp.* does not cite *Jean* or articulate any meaningful way to distinguish that case. Indeed, the opinion does not suggest that the parties actually disagreed about the Court's

piecemeal approach.  This Court is bound by the decision of the Supreme Court and will make

only one threshold determination as to whether the position of the United States was

substantially justified.[2]  In the present case, the common thread that runs through HUD's

prelitigation conduct and its litigation position is the validity of 24 C.F.R. § 206.27(c)(1) in light

of 12 U.S.C. § 1715z-20(j).  To determine whether the government's position was substantially

justified, therefore, this Court will assess "the strength of the government's position" with

respect to its arguments on the merits of the case.  *Taucher*, 396 F.3d at 1173.

The merits of the underlying litigation turned on the interpretation of the following

statutory language:

> The Secretary may not insure a home equity conversion mortgage under this
> section unless such mortgage provides that the homeowner's obligation to satisfy
> the loan obligation is deferred until the homeowner's death, the sale of the home,
> or the occurrence of other events specified in regulations of the Secretary. *For
> purposes of this subsection, the term "homeowner" includes the spouse of a
> homeowner.*

12 U.S.C. § 1715z-20(j) (emphasis added).  Plaintiffs interpreted the above-quoted language as

forbidding HUD from insuring any HECM that failed to defer the obligation to repay the loan

until *both* the homeowner and his or her spouse died, regardless of whether the spouse was an

obligor.  *Bennett II*, 4 F. Supp. 3d at 10.  In response, defendant contended that subsection (j)

---

[2] Defendant also cites *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, &
Explosives*, 698 F. Supp. 2d 168 (D.D.C. 2010), as an example of a post-*Jean* case that
conducted multiple substantial justification analyses.  That Court considered the effect of *Jean*
on *Cinciarelli*. *Id.* at 175 ("In the twenty years since Jean was decided, the Circuit has not
provided further guidance on the propriety of conducting multiple substantial justification
inquiries outside the fee litigation context . . . .").  It conducted separate substantial justification
inquiries, but it did so "for two entirely distinct factual and legal events," where the object of the
second inquiry was "akin to an entirely new civil action." *Id.*  That approach is clearly
distinguishable from the present case, where the government asks this Court to conduct separate
substantial justification inquiries for its procedural and substantive arguments, which relate to the
same civil action.

only requires protection of homeowner spouses – that is, spouses with an obligation to satisfy the loan obligation.  (Def.'s MSJ at 14-16.)

This Court's analysis began with the plain meaning of the statute.  *See Bennett II*, 4 F. Supp. 3d at 9-12.  The critical flaw in defendant's interpretation was that it "render[ed] the second sentence of subsection (j) mere surplusage."  *Id.* at 10.  This was so because, "[i]f a spouse is a co-obligor on the reverse mortgage, then he or she would automatically be considered a 'homeowner' under the terms of the statute."  *Id.*  Defendant has never offered a plausible response to this argument.  For example, in its motion for summary judgment, after acknowledging plaintiffs' charge of superfluity, defendant stated that "[t]he second sentence is necessary to ensure that a HECM on a jointly-owned home does not become due and payable when one borrower spouse dies."  (Def.'s MSJ at 16.)  This is simply not so.  The first sentence would afford homeowner status, and thus displacement protection, to both spouses on a jointly-owned home.  Defendant made a similar argument later in its motion for summary judgment, contending that "[i]n the absence of the second sentence of Subsection (j), a due-on-sale clause could be triggered by the death of one joint tenant, or one member of a tenancy by the entirety." (*Id.* at 18.)  Again, defendant failed to articulate why the first sentence would not prohibit such a clause in a mortgage contract where both spouses were obligors.  *See Bennett II*, 4 F. Supp. 3d at 11.  Moreover, as this Court explained in *Bennett II*, if Congress had intended the second sentence to protect only joint mortgagors or joint tenants, the statute could easily have been drafted to specify that "the term 'homeowners' includes each mortgagor."  *Id.*  Even in its briefing on the present motion, defendant does not address this argument.  At bottom, the most significant reason why the government's position failed is because defendant did not put forward

an interpretation of 12 U.S.C. § 1715z-20(j) that gave meaning to both of that subsection's first two sentences.

Defendant also failed to offer any meaningful critique of plaintiffs' interpretation.  It charged, for instance, that plaintiffs' reading of the statute failed because, "[a]lthough the term 'homeowner' appears twice in the first sentence of Subsection (j), Plaintiffs attempt to substitute the term 'spouse' for only one of those."  (Def.'s MSJ at 15-16.)  This argument, however, misunderstands plaintiffs' interpretation.  As explained in *Bennett II*, plaintiffs contend not that the term "spouse" be substituted for the term "homeowner," but rather that the phrase "the homeowner and that homeowner's spouse" replace the term "homeowner."  4 F. Supp. 3d at 10. This interpretation is critical to giving effect to the word "includes" in the statute.  *See id.* at 12. Defendant never explains why, if "the homeowner and that homeowner's spouse" is substituted for the word "homeowner" throughout subsection (j), the homeowner's loan should not be deferred until both the homeowner and the homeowner's spouse have died.  Thus, another reason why defendant lost is because it failed to provide any persuasive criticism of plaintiffs' straightforward interpretation of the statute.

Notwithstanding the fact that the statute's plain language "'unambiguously foreclos[ed]' defendant's interpretation," *id.* at 17, it is possible that strong extrinsic evidence might nevertheless have made defendant's position reasonable.  *See, e.g.*, *Hill v. Gould*, 555 F.3d 1003, 1007-09 (D.C. Cir. 2009) (denying fees where the statute's "enactment's context and underlying policies cast doubt on" its plain meaning).  In this case, however, the weight of legislative history was not on defendant's side.  A Senate Report of the Committee on Banking, Housing and Urban Affairs stated that subsection (j) was intended to "defer[] repayment obligation until death of the home owner and the homeowner's spouse."  S. Rep. No. 100-21, at 28 (1987).  Clearly, this

evidence weighs in favor of plaintiffs' interpretation of the statute.  In response, defendant cited

a House Conference Report for the Housing and Community Development Act of 1987, which,

defendant argued, "indicat[ed] Congress' intent to confer upon the Secretary the broad discretion

necessary to operate the HECM insurance in a financially responsible manner."  (Def.'s MSJ at

26-27 & n.18 (citing 1987 U.S.C.C.A.N. 3512).)  But the Conference Report "fails to shed light"

on the parties' competing interpretations of subsection (j).  *Bennett II*, 4 F. Supp. 3d at 14.  Thus,

another reason why defendant lost in the underlying litigation was because the only relevant

legislative history before this Court favored plaintiffs' interpretation.

Defendant alternatively argued that HUD was empowered to promulgate 24 C.F.R. §

206.27(c)(1) in light of the "other events" clause in subsection (j).  12 U.S.C. § 1715z-20(j)

("The Secretary may not insure a home equity conversion mortgage under this section unless

such mortgage provides that the homeowner's obligation to satisfy the loan obligation is deferred

until the homeowner's death, the sale of the home, *or the occurrence of other events specified in*

*regulations of the Secretary*." (emphasis added)).  Defendant claimed that "HUD elected to make

the death of all *borrowers* a triggering event" pursuant to the "other events" clause.  (Def.'s MSJ

at 20.)  As this Court said in *Bennett II*, the "other events" clause "does not give HUD the

statutory authority to alter the specific triggering events identified in the statute."  4 F. Supp. 3d

at 14.  To do so would "render another statutorily-specified triggering event . . . meaningless."

*Id.*  Thus, it "is not a plausible reading of the statute," *id.*, and is not a substantially justified

position.  *See Air Transp. Ass'n of Can. v. FAA*, 156 F.3d 1329, 1332-33 (D.C. Cir. 1998) ("We

cannot hold that an attempt by an agency to completely displace Congress is substantially

justified.").

Defendant makes several additional arguments.  First, defendant contends that since the agency "adopted [its] statutory interpretation through notice and comment rulemaking and has adhered to that interpretation consistently for almost 25 years, the government's decision to defend that position in litigation [was] substantially justified."  (Def.'s Opp. at 9-10.)  The "position of the United States," however, means both "the position taken by the United States in the civil action" and "the action or failure to act by the agency upon which the civil action is based."  28 U.S.C. § 2412(d)(2)(D).  Thus, the question before this Court is not whether HUD is now acting reasonably in choosing to defend its regulation, but rather, whether its original promulgation and subsequent justification of the regulation were substantially justified.  As explained above and in *Bennett II*, the agency has not put forward an interpretation of the statute that comports with either its plain meaning or its legislative history.  Thus, even though courts "normally accord particular deference to an agency interpretation of longstanding duration," *Barnhart v. Walton*, 535 U.S. 212, 220 (2002) (internal quotation marks omitted), "a reviewing court should not defer to an agency position which is contrary to an intent of Congress expressed in unambiguous terms."  *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992); *see also Brown v. Gardner*, 513 U.S. 115, 122 (1994) ("A regulation's age is no antidote to clear inconsistency with a statute . . . .").

In a similar vein, defendant now argues that its interpretation of subsection (j) was justified because "it was the interpretation of those who originally assembled the HECM program and met with no disagreement during that process."  (Def.'s Opp. at 10.)  Defendant points out that HUD promulgated 24 C.F.R. § 206.27(c)(1) slightly more than a year after Congress passed the HECM statute and that it did not receive any objections to its interpretation during the rulemaking process.  (*Id.* at 10-11.)  Quoting *Udall v. Tallman*, 380 U.S. 1, 16 (1965),

defendant argues that great deference should be afforded to "a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion." (*Id.* at 10.) *Udall* itself, however, makes clear that such deference is only appropriate "[i]f . . . the Secretary's interpretation is not unreasonable [and] if the language . . . bears his construction." 380 U.S. at 18. As noted, post-*Chevron* cases make clear that deference is inappropriate where the statutory text is unambiguous. *See Nicklos Drilling Co.*, 505 U.S. at 476; *D.C. Hosp. Ass'n v. District of Columbia*, 224 F.3d 776, 780 (D.C. Cir. 2000) ("Because the provision at issue here is unambiguous, we owe no deference to a contrary construction even if formally adopted by the Secretary of [HHS].").

Next, defendant argues that "in over 25 years, and despite ample opportunity, Congress has declined to correct HUD's interpretation of Subsection (j)" despite having "amended 12 U.S.C. § 1715z-20 on several occasions." (Def.'s Opp. at 11.) Defendant asserts that "when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." (*Id.* (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986).) Defendant's argument fails again, however, in the face of an unambiguous statute. "[C]ongressional silence 'lacks persuasive significance,' particularly where administrative regulations are inconsistent with the controlling statute." *Gardner*, 513 U.S. at 121 (quoting *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994)); *see also Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991) ("Where the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction."). Moreover, "application of the legislative reenactment doctrine requires a showing of both congressional awareness and

15

'express congressional approval of an administrative interpretation if it is to be viewed as statutorily mandated.'" *Gen. Am. Transp. Corp. v. ICC*, 872 F.2d 1048, 1053 (D.C. Cir. 1989) (quoting *AFL-CIO v. Brock*, 835 F.2d 912, 915 (D.C. Cir. 1987)).  Neither is present here, so there is no basis to infer that any reenactment constitutes an approval of HUD's interpretation.

Finally, defendant argues that its position was substantially justified because "prior to the Court of Appeals decision in this case, no court at any level had ever questioned HUD's interpretation of Subsection (j)."  (Def.'s MSJ at 12.)  But neither was there any law affirming HUD's interpretation since, as far as the Court is aware, plaintiffs are the first to challenge the provisions at issue.  The D.C. Circuit, moreover, has held that "the absence of contrary case law does not necessarily lead to the . . . conclusion . . . that the [government's] position was substantially justified." *Halverson*, 206 F.3d at 1210 (emphasis omitted).  The fact that no one has ever challenged 24 C.F.R. § 206.27(c)(1) before does not make defendant's justification of it plausible.

At bottom, defendant has failed to articulate a position that has a "reasonable basis both in law and fact." *Pierce*, 487 U.S. at 565.  Its interpretation of the statute contradicted the unambiguous, plain language of 12 U.S.C. § 1715z-20(j).  The legislative history militates against defendant's position, and its new arguments provide no real support.  For these reasons, this Court finds that the position of the United States was not substantially justified. *See F.J. Vollmer Co. v. Magaw*, 102 F.3d 591, 593 (D.C. Cir. 1996) ("[W]e conclude that the agency's position was not substantially justified because it was wholly unsupported by the text, legislative history, and underlying policy of the governing statute.").

## III.    FEE CALCULATION

Since plaintiffs have prevailed, and because the government's position was not substantially justified, plaintiffs are entitled to "reasonable" attorney's fees and expenses. 28 U.S.C. § 2412(d)(2)(A). "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Id.* at 437. Plaintiffs have submitted detailed records of their attorneys' hours, costs, and expenses. (*See* Mehri & Skalet Fees [ECF No. 51-2] ("M&S Fees"); Mehri & Skalet Costs Report [ECF No. 51-3] ("M&S Costs"); Mehri & Skalet Expense Report [ECF No. 51-4] ("M&S Expenses"); AARP Fees [ECF No. 51-6] ("AARP Fees"); Mehri & Skalet Fees [ECF No. 57-4] ("M&S Fees Update"); Mehri & Skalet Expense Report [ECF No. 57-5] ("M&S Expenses Update").) In their original motion, plaintiffs requested payment for 1,465.46 attorney hours and 74.5 paralegal hours, for a total award of $286,121.60 in fees, plus $3,668.96 in costs and $4,141.84 in expenses. (Pls.' Mot. at 10-11.) In their reply, plaintiffs reduced their request by $5,071.31 in fees in response to defendant's objections. (*See* Pls.' Reply at 24; Decl. of Craig L. Briskin [ECF No. 57-1] ("Briskin Decl."); Decl. of Jean Constantine-Davis [ECF No. 57-6] ("Davis Decl.").) Plaintiffs also requested an additional $11,873.83 in fees and $405.28 in expenses that they have incurred since filing their original motion. (Pls.' Reply at 24.) Defendant objects both to the rates and the numbers of hours for which plaintiffs request reimbursement.

## A. Hourly Rate

The EAJA provides that "[t]he amount of fees awarded . . . shall be based upon prevailing market rates for the kind and quality of the services furnished," except that "attorney

fees shall not be awarded in excess of $ 125 per hour unless the court determines that an increase

in the cost of living . . . justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A).  Plaintiffs request a

cost-of-living enhancement above the $125-per-hour statutory cap for their attorneys' fees.  (Pls.'

Mot. at 10.)  In particular, they request that the hourly rates be adjusted for inflation using annual

regional Consumer Price Index for All Urban Consumers (CPI-U) data.  *See Porter v. Astrue*,

999 F. Supp. 2d 35, 38-41 (D.D.C. 2013) (explaining methodology).  This calculation produces

the follow hourly rates:

| Year | Attorney Hourly Rate |
|------|---------------------|
| 2013 | $190.63 |
| 2012 | $187.77 |
| 2011 | $183.72 |
| 2010 | $177.77 |

 (*See* M&S Fees; AARP Fees.)  For 2014, plaintiffs request a rate of $192.13/hour.  (*Id.*)  They

do not explain how they arrived at this figure, but the Court can infer that plaintiffs used the

regional CPI-U through January 2014.[3]  Defendant does not object to plaintiffs' attorneys'

hourly rates.[4]  The Court finds the rates to be reasonable.

Plaintiffs also request reimbursement for work done by paralegals.  They claim that the

paralegals' "work is recoverable at the prevailing market rate," which plaintiffs assert is

$195/hour because that "is the rate they bill in non-EAJA cases."  (Pls.' Mot. at 10.)  Defendant

objects that "[p]laintiffs offer no evidence that this rate corresponds with the prevailing market

---

[3] The CPI-U as of January 2014 was 153.7.  *Consumer Price Index Historical Tables for Washington-Baltimore, DC-MD-VA-WV*, Bureau of Labor Statistics, http://www.bls.gov/ro3/fax_9156.htm (last visited Nov. 18, 2014).  The relevant calculation is $125 x $153.7 / $100 = $192.125.  *See Porter*, 999 F. Supp. 2d at 41.

[4] Defendant does complain that plaintiffs "failed to provide any evidence of the qualifications or market rate of the four attorneys billing time on the case other than Mr. Briskin and Ms. Constantine-Davis."  (Def.'s Opp. at 24.)  However, plaintiffs provided this information in their reply.  (*See* Briskin Decl. at 1-2.)  The Court finds that plaintiffs' supplemental declaration satisfies the concerns raised by defendant.

rate for paralegals of similar competence and experience in the Washington, D.C., area" and argues that reimbursement for paralegal time should be governed by the *Laffey* matrix.  (Def.'s Opp. at 25.)  In reply, plaintiffs maintain that their "paralegals are billed out at [$195/hour]," or in the alternative, plaintiffs contend that they are at least entitled to the paralegal rates contained in the Updated *Laffey* Matrix, which is indexed to the price of legal services.  (Pls.' Reply at 15.)

Both parties correctly acknowledge that "a prevailing party that satisfies EAJA's other requirements may recover its paralegal fees from the Government at prevailing market rates." *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 590 (2008).  As the D.C. Circuit has explained, "plaintiffs must produce data concerning the prevailing market rates in the relevant community for attorneys of reasonably comparable skill, experience, and reputation."  *Covington v. District of Columbia*, 57 F.3d 1101, 1108 (D.C. Cir. 1995); *see also Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) ("[T]he burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.").  Plaintiffs' only evidence of the prevailing market rate is an affidavit from one of their attorneys stating, "My firm currently bills paralegal time at a rate of $195 per hour."  (Decl. of Craig L. Briskin in Supp. of Pls.' Mot. for Attorneys' Fees, Costs, and Expenses [ECF No. 51-1] at 3.)  This bare assertion is insufficient to establish the market rate for paralegal work in Washington, D.C.  *See Covington*, 57 F.3d at 1109 ("In order to demonstrate [the prevailing market rate], plaintiffs may point to such evidence as an updated version of the *Laffey* matrix or

the U.S. Attorney's Office matrix, or their own survey of prevailing market rates in the community.").[5]

Having concluded that plaintiffs have not otherwise established the prevailing market rate, this Court will follow defendant's suggestion and use the *Laffey* matrix in calculating plaintiffs' compensation for their paralegals' work. That matrix, which was developed in *Laffey v. Northwest Airlines*, 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part and rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), lists reasonable fees for legal professionals with varying years of experience. There are, however, "two different versions of [the matrix that have been] used as proof of prevailing market rates in federal court litigation in the District of Columbia." *Smith v. District of Columbia*, 466 F. Supp. 2d 151, 156 (D.D.C. 2006).

> One version, which is maintained by the Civil Division of the Office of the United States Attorney ("USAO Matrix"), calculates the matrix rate for each year by adding the change in the overall cost of living, as reflected in the United States [CPI] for the Washington, D.C. area for the prior year, and then rounding that rate to the nearest multiple of $5. A second, slightly different version of the *Laffey* Matrix ("Updated *Laffey* Matrix"), also in use in the Washington, D.C. area, calculates the matrix rates for each year by using the legal services component of the CPI rather than the general CPI on which the U.S. Attorney's Office Matrix is based.

*Id.* (citations and internal quotation marks omitted). Plaintiffs urge this Court to use the Updated *Laffey* Matrix, while defendant argues for the USAO Matrix. (*See* Pls.' Reply at 15; Def.'s Opp. at 25.) Several recent opinions in this Circuit have made a cogent case for the Updated *Laffey* Matrix. *See Eley v. District of Columbia*, 999 F. Supp. 137, 150-56 (D.D.C. 2013); *Salazar v. District of Columbia*, 750 F. Supp. 2d 70, 72-74 (D.D.C. 2011). This Court, however, has

---

[5] Because plaintiffs have failed to put forward evidence that the prevailing market rate for paralegal work is $195/hour, this Court need not decide whether the statutory cap in 28 U.S.C. § 2412(d)(2)(A) applies to paralegal fees. *Compare Conservation Force v. Salazar*, 916 F. Supp. 2d 15, 27 (D.D.C. 2013) (cap does not apply), *with Abusamhadaneh v. Taylor*, No. 1:11-cv-939, 2013 U.S. Dist. LEXIS 7451, at *53 (E.D. Va. Jan. 17, 2013) (cap does apply).

previously found that "the USAO matrix more accurately reflects the prevailing market rates in the Washington, D.C. legal market," noting that the "updated *Laffey* matrix 'reflects *national* inflation trends,' while the USAO matrix 'relies on data specific to the Washington, D.C. metropolitan area.'"  *Berke v. Fed. Bureau of Prisons*, 942 F. Supp. 2d 71, 77 (D.D.C. 2013) (quoting *Miller v. Holzmann*, 575 F. Supp. 2d 2, 17 (D.D.C. 2008)).  The D.C. Circuit, moreover, has explicitly approved the use of the USAO Matrix.  *See Covington*, 57 F.3d at 1109.  The Court will therefore use those rates in awarding fees for plaintiffs' paralegals' work.[6]  The rates are as follows:

| Year | Paralegal Hourly Rate |
|---|---|
| 6/01/14 - 5/31/15 | $150 |
| 6/01/13 - 5/31/14 | $145 |
| 6/01/12 - 5/31/13 | $145 |
| 6/01/11- 5/31/12 | $140 |
| 6/01/10 - 5/31/11 | $135 |

In their original motion, plaintiffs requested compensation for a total of 74.5 paralegal hours at a rate of $195/hour for an award of $14,527.50.  (*See* M&S Fees; Pls.' Mot. at 11.)  Based on the foregoing rate schedule, the Court will reduce that amount by $4,102.50 to $10,425.[7]

### B.  Number of Hours

#### a.  Unsuccessful claims

---

[6] Plaintiffs also suggest that this Court should award current rather than historical rates of compensation.  (Pls.' Reply at 15.)  While the Court does have this option, *see Missouri v. Jenkins*, 491 U.S. 274, 284 (1989)), it is not the typical practice, and plaintiffs do not explain why it would be appropriate in the present case.  *See Covington v. District of Columbia*, 839 F. Supp. 894, 902 (D.D.C. 1993) ("Generally, to collect current rates plaintiffs must show that the delay in fee payment has produced some degree of hardship such that an award of current rates does not produce a windfall.").  The Court will apply historical rates of compensation.  *See Laffey*, 746 F.2d at 20 n.104 ("[T]he district court should simply match the billing rate governing a particular period to the hours reasonably expended during that period.").
[7] The Court calculates that 25 hours should be billed at $135/hour, 25.5 hours should be billed at $140/hour, and 24 hours should be billed at $145/hour.

Defendant objects on multiple grounds to the number of hours for which plaintiffs request payment.  First, defendant argues that plaintiffs' requested fee award includes claims on which plaintiffs did not prevail.  In particular, defendant argues that plaintiffs did not prevail on Counts I-III of their complaint, and that those counts were "wholly distinct from those relating to Count IV, which concerned HUD's interpretation of Subsection (j)."  (Def.'s Opp. at 14.)

Plaintiffs' complaint, filed on March 8, 2011, originally had four counts.  (*See* Compl. for Declaratory and Injunctive Relief [ECF No. 1] ("Complaint").)  Count IV claimed that HUD's regulations violated 12 U.S.C. § 1715z-20(j) and has been the focus of the present litigation.  (*See id.* at 26-27.)  Counts I-III concerned Mortgagee Letter 2008-38 ("ML 2008-38"), which allegedly changed HUD's treatment of HECMs in two ways.  First, plaintiffs argued that ML 2008-38 modified HUD's interpretation of the term "non-recourse" such that "a deceased borrower's spouse or heirs must repay the entire mortgage balance to retain the property."  (*Id.* at 10.)  Second, plaintiffs contended that ML 2008-38 imposed a new "arm's-length" requirement disallowing the mortgagor from paying off the loan with the proceeds of a sale of the property for less than the full mortgage balance if the sale was to the mortgagor's spouse or heirs.  (*Id.* at 10-11.)  In Count I, plaintiffs argued that HUD's issuance of ML 2008-38 violated the Administrative Procedure Act by failing to provide notice and an opportunity for comment.  (*Id.* at 23.)  Count II alleged that HUD's retroactive application of ML 2008-38 violated the disclosure and counseling requirements in 12 U.S.C. § 1715z-20(e) and (f).  (*Id.* at 24-25.)  Count III argued that the arm's-length rule in ML 2008-38 was arbitrary and capricious.  (*Id.* at 25-26.)

On April 5, 2011, HUD rescinded ML 2008-38.  (Def.'s Mot. to Dismiss, Ex. 3 [ECF No. 9-3].)  Plaintiffs withdrew Counts I-III as moot.  (Pls.' Mem. in Opp. to Def.'s Mot. to Dismiss

[ECF No. 13] at 3-4.).  Defendant now charges that plaintiffs did not prevail on these counts and urges this Court to reduce plaintiffs' hours expended prior to April 5, 2011, by 75%.  (Def.'s Opp. at 15.)

The Supreme Court has made clear that fee applicants may not be compensated for time spent on unsuccessful claims unrelated to the claims on which the party prevailed.  In *Hensley v. Eckerhart*, the Court explained:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories.  In such a suit, even where the claims are brought against the same defendants . . . counsel's work on one claim will be unrelated to his work on another claim.  Accordingly, work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved.  The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

461 U.S. at 434-35 (internal quotation marks omitted); *see also id.* at 440 ("Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee.");  *Anthony v. Sullivan*, 982 F.2d 586, 589 (D.C. Cir. 1993) ("[N]o fee may be granted for work done on claims on which the party did not prevail, unless the unsuccessful claims were submitted as alternative grounds for a successful outcome that the plaintiff did actually achieve.").

The first question, then, is whether plaintiffs prevailed on Counts I-III.  The Supreme Court's holding in *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001), is dispositive of this issue.  In that case, plaintiffs had brought suit against West Virginia, claiming that a state statute violated federal law.  *Id.* at 600-01.  The West Virginia legislature subsequently amended the statute, and the

district court dismissed the suit as moot. *Id.* at 601.  Rejecting plaintiffs' request for attorney's

fees on the grounds that they were not "prevailing parties," the Supreme Court held that "[a]

defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff

sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." *Id.* at

605.  This logic is directly applicable to the present case.  Even though plaintiffs achieved their

ultimate goal when HUD withdrew ML 2008-38, they did not prevail on Counts I-III because

HUD's action was voluntarily undertaken.

Notwithstanding the fact that plaintiffs did not prevail on Counts I-III, they could still

recover fees for their attorneys' work on those counts, for if "plaintiff's claims for relief . . .

involve a common core of facts or [are] based on related legal theories," such that it is "difficult

to divide the hours expended on a claim-by-claim basis," the fee award should simply be based

on "the significance of the overall relief obtained by the plaintiff in relation to the hours

reasonably expended on the litigation." *Hensley*, 461 U.S. at 435.  In the present case, however,

Counts I-III involved both a different set of facts and different legal theories than Count IV.

Counts I-III related to a single mortgagee letter, issued in 2008, which discusses HUD's

interpretation of the term "non-recourse."  Count IV concerned a regulation first passed in 1989,

which specifies when a mortgage may become due and payable to qualify for federal insurance.

Besides relating to HECMs, these promulgations are wholly disconnected, and plaintiffs'

criticisms of them rise and fall independently.  Accordingly, because plaintiffs did not prevail on

Counts I-III, and because those counts were unrelated to the count plaintiffs did prevail on,

plaintiffs are not entitled to compensation for their attorneys' work related to Counts I-III.

It is not possible to discern from plaintiffs' attorneys' billing records which hours were

spent on which counts.  Defendant contends that plaintiffs' attorneys billed 559 attorney hours

and 17 paralegal hours[8] prior to April 5, 2011, when HUD rescinded ML 2008-38, and requests

that plaintiffs' hours for those days be reduced by 75%.  (Def.'s Opp. at 15.)  A 75% reduction,

however, places undue emphasis on the mere number of counts, which is not necessarily

correlated with the effort expended by plaintiffs' attorneys.  While each count is legally distinct,

Counts I-III share the common factual denominator of objecting to ML 2008-38.  As such, the

Court believes that the fairer approach is to assume that plaintiffs' attorneys split their time

equally between ML 2008-38 and 24 C.F.R. § 206.27(c)(1).  The Court, therefore, will reduce

plaintiffs' pre-April 5, 2011, hours by 50%, which amounts to 279.5 attorney hours and 9.25

paralegal hours. The Court calculates that plaintiffs' attorneys billed $101,189.61 prior to April

5, 2011, and therefore, a reduction of $50,594.81 is appropriate.  All of the relevant paralegal

hours were billed between June 1, 2010 and May 31, 2011, resulting in a reduction of $1,248.75.

The Court will also reduce plaintiffs' costs and expenses incurred prior to April 5, 2011, by 50%,

which results in a $540.62 reduction.  The total reduction for unsuccessful claims amounts to

$52,384.18.

Defendant's next argument is that plaintiffs should not be compensated for work relating

to issues on which the government's position was substantially justified.  (Def.'s Opp. at 15-16

(citing *Cinciarelli*, 729 F.2d at 802).)  Defendant argues that its standing argument was

substantially justified and urges this Court to deduct the approximately 600 hours plaintiffs billed

working on that topic.  (*See id.* at 16.)  As explained above, however, the Supreme Court has

explicitly rejected requests such as defendant's for courts to conduct multiple substantial

justification inquiries.  *See Jean*, 496 U.S. at 161-62.  This Court therefore declines to consider

---

[8] The Court counts 18.5 paralegal hours expended during this interval and will use that figure in
its calculations.

whether the government's standing argument was substantially justified or to deduct any hours for plaintiffs' attorneys' work on that argument.

### b. Excessive hours

Next, defendant contends that "[p]laintiffs' claim for fees and costs includes an excessive, unnecessary amount of hours" and argues that "appropriate reductions must be made to eliminate this excess."  (Def.'s Opp. at 16.)  Defendant calls the 576 hours plaintiffs' attorneys billed for "all the preliminary work in the case," "staggering."  (*Id.*)  This "preliminary work" includes all of plaintiffs' attorneys' time billed "up through the preparation and filing of the Complaint and the motion for preliminary injunction."  (*Id.* at 16-17.)  Defendant points to three specific "examples of plaintiffs' lack of billing judgment": a 4.6-hour entry for "pull[ing] all cases cites [and] organiz[ing] cases"; several unspecified time entries allegedly adding up to 6 hours of paralegal time related to retrieving a transcript; and an 8-hour time entry described as "[p]reparation for and participation in meeting with co-counsel," where several other lawyers billed between 1.5 and 2.5 hours for attending that meeting.  (*See id.* at 17 (citing AARP Fees at 34; M&S Fees at 54-56; AARP Fees at 15; M&S Fees at 12).)

Fee applicants must "exercise 'billing judgment' with respect to hours worked."  *Hensley*, 461 U.S. at 437.  "[H]ours that were not 'reasonably expended'" are to be "exclude[d] from [the] fee calculation."  *Id.* at 434 (quoting S. Rep. No. 94-1011, at 6 (1976)).  District court judges have "substantial discretion in fixing the amount of an EAJA award."  *Jean*, 496 U.S. at 163.

The Court cannot conclude that plaintiffs billed an excessive number of hours.  First, the D.C. Circuit has instructed that a district court should "consider objections to filed hours only where it has been presented with a reasonable basis for believing the filing is excessive." *Donnell v. United States*, 682 F.2d 240, 250 (D.C. Cir. 1982).  Defendant provides practically no

justification for its claim that the 576 hours plaintiffs' attorneys spent on "preliminary work" was excessive.  Defendant cites to only three minor examples of allegedly excessive billing entries. This Court finds two of those entries – 4.6 hours for pulling and organizing cases and 8 hours for preparing for and participating in a meeting with co-counsel – to be reasonable.  Defendant's remaining criticism does not cite particular entries in plaintiffs' billing records and is thus not described with sufficient specificity for this Court to evaluate.  Second, the Court believes that defendant underestimates the complexity and difficulty of plaintiffs' undertaking.  The 576 hours that defendant criticizes were billed over the course of an entire year, during which time plaintiffs leveled challenges against two separate HUD promulgations.  The issues in this case were novel, and it was reasonable for plaintiffs to engage in extensive case and legislative history research.  Moreover, as plaintiffs point out, the parties spent a substantial amount of time during that year negotiating with each other over HUD's policies.  (Pls.' Reply at 18.)   Finally, the Supreme Court has emphasized that degree of success is "the most critical factor" in evaluating the reasonableness of a fee award.  *Hensley*, 461 U.S. at 436.  Plaintiffs have thus far been successful.  *See supra* Section I.  Therefore, the Court concludes that the hours plaintiffs' attorneys worked were not excessive.[9]

### c.   Non-compensable tasks

---

[9] Relatedly, defendant argues that plaintiffs' time should be cut by 46 hours spent "researching abandoned legal theories" including "the abandoned breach-of-contract theory and the similarly abandoned class action complaint."  (Def.'s Opp. at 18.)  But defendant cites no precedent for the proposition that researching dead ends is not compensable.  Here, plaintiffs ultimately prevailed, and they may be compensated for work done on arguments related to the claims they prevailed on, even if they did not rely on those arguments.  *See Am. Petroleum Inst. v. EPA*, 72 F.3d 907, 912 (D.C. Cir. 1996) ("It is not necessary that a fee-petitioning client and its attorney have acted with the 20/20 acuity of hindsight in developing their arguments in order to collect attorneys' fees.").  To hold otherwise would force attorneys to voice every argument they considered, lest they see their hours cut.

Defendant next objects that plaintiffs are seeking payment for tasks that are not compensable.  First, defendant cites 21 hours plaintiffs' attorneys spent on media-related activities.  (Def.'s Opp. at 17.)  The Court agrees with defendant that time spent on media relations are not compensable.  *See Role Models Am.*, 353 F.3d at 973 ("In this circuit, the government cannot be charged for time spent in discussions with the press.").  Plaintiffs have agreed to deduct 6.32 hours related to these activities.  (Briskin Decl. at 4-5 (1.87 hours); Davis Decl. at 3 (4.45 hours).)  The Court finds reasonable the 1.87 hours of deductions suggested in the Briskin Declaration, but the Davis Declaration, which does not specify which hours it proposes cutting, slightly underestimates the amount of media-related time billed by AARP.  Accordingly, the Court will reduce plaintiffs' time by a further 7.8 hours, for a total media-related reduction of 9.67 hours.   These hours were all billed in 2011 at a rate of $183.72/hour, and so the media-related deduction totals $1,776.57.

Defendant next requests that the Court deduct from plaintiffs' time 35 hours "spent on administrative tasks such as soliciting and retaining clients and maintaining files and calendars." (Def.'s Opp. at 18.)  Defendant correctly points out that "purely clerical or secretarial tasks should not be billed at a paralegal [or attorney] rate regardless of who performs them."  (*Id.* (alteration in original) (quoting *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989)).)  Plaintiffs agree that "administrative time . . . should be deducted," but they contest the classification of the entries highlighted by defendant.  (Pls.' Reply at 22.)  They offer to deduct 21.05 hours spent on administrative tasks.  (Briskin Decl. at 2-4 (10.5 hours); Davis Decl. at 3 (10.55 hours).)  The Court agrees with plaintiffs that some of the line entries objected to by defendant are properly

legal, even if they relate to potential new clients,[10] and finds reasonable plaintiffs' proposed

reductions.  The Court accordingly will deduct 21.05 hours from plaintiffs' award, which, after

adjusting the paralegal hourly rates as explained above, results in a reduction of $3,386.36.[11]

### d.  Improper billing descriptions

Defendant's final argument is that "plaintiffs have failed to provide sufficiently clear or

detailed billing statements to allow a careful assessment of their reasonableness and allocation of

fees to different claims or defenses."  (Def.'s Opp. at 19.)  Relatedly, defendant contends that

"[p]laintiffs also engage[d] in block billing, making it impossible to discern the exact amount of

time spent on separate tasks."  (*Id.*)  Defendant identifies 280 vague or block time entries and

requests a reduction of 350 hours.  (*Id.* at 19 & n.15.)  Plaintiffs respond that "HUD's argument

that Plaintiffs have failed to submit clear and detailed billing statements is itself not clear or

detailed," and they give several examples of time entries cited by HUD that plaintiffs claim are

sufficiently clear.  (Pls.' Reply at 21.)  Plaintiffs also dispute whether defendant's examples

amount to block billing.  (*Id.* at 22.)

A fee applicant's "supporting documentation must be of sufficient detail and probative

value to enable the court to determine with a high degree of certainty that such hours were

actually and reasonably expended."  *Role Models Am.*, 353 F.3d at 970 (quoting *In re Olson*, 884

F.2d 1415, 1428 (D.C. Cir. 1989) (*per curiam*)) (internal quotation marks omitted).  Where a

party's "documentation . . . [does] not adequately describe the legal work for which the client is

---

[10] (*See, e.g.*, AARP Fees at 10, Slip No. 3573 ("Telephone interviews with various potential named class plaintiffs counsel"); M&S Fees at 34, Slip No. 188510 ("Review e-mails regarding enforcement of rights to purchase for 95%; email regarding new RM client").)

[11] AARP agreed to deduct 10.55 hours billable at a rate of $183.72/hour, for a total reduction of $1,938.24.  (Davis Decl. at 3.)  Mehri & Skalet agreed to deduct 0.5 attorney hours, billed at $183.72/hour, 9 paralegal hours properly billable at $135/hour, 0.75 paralegal hours billable at $140/hour, and 0.25 paralegal hours billable at $145/hour, for a total reduction of $1,448.11.  (Briskin Decl. at 2-4.)

being billed," a court cannot "verify the reasonableness of the billings, either as to the necessity of the particular service or the amount of time expended on a given legal task." *In re Sealed Case*, 890 F.2d 451, 455 (D.C. Cir. 1989) (*per curiam*).  The D.C. Circuit, for example, criticized billing records consisting of "eight consecutive weekdays" of the same "identical one-line entry, 'research and writing for appellate brief.'" *Role Models Am.*, 353 F.3d at 971.  It has also found insufficient billing entries for meetings and telephone conferences where "no mention [was] made of the subject matter." *In re Meese*, 907 F.2d 1192, 1204 (D.C Cir. 1990) (*per curiam*); *accord Role Models Am.*, 353 F.3d at 971 ("Similarly inadequate are the numerous entries . . for time spent in teleconferences . . . the purposes of which are not provided.").  On the other hand, a "fee application need not present 'the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney.'" *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982) (*per curiam*) (quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C Cir. 1980) (*en banc*)).  As such, the entries "Research and drafting of FOIA part of complaint" and "Court appearance on plaintiffs' motion for a preliminary injunction" have been found to be "entirely adequate." *Id.* at 1332. Finally, block billing, *i.e.*, "lump[ing] together multiple tasks," is disfavored because, if some of the lumped tasks should not be reimbursed, the Court cannot "verify[] that [the party] deducted the proper amount of time." *Role Models Am.*, 353 F.3d at 971.

The 280 time entries[12] listed (largely without commentary) by defendant are, to be sure, a mixed bag.  Many of them are clearly sufficiently specific.[13]  Others are closer to the line, yet

---

[12] Two of the entries defendant lists – 179139 and 246181 – do not appear in plaintiffs' billing records.  The Court will not consider those entries in its final award calculation.

[13] (*E.g.*, M&S Fees at 57, Slip No. 229071 ("Email Benjamin Schultz at DOJ regarding talks with HUD; email JCD."); *id.* at 60, Slip No. 235565 ("Review and edit status report on discovery relating to standing; e-mails."); *id.* at 65, Slip No. 238813 ("Review letter from defendant to

nevertheless reasonable.  As a representative example, one of plaintiffs' attorneys billed 0.30

hours for "Email to team regarding call with HUD."  (M&S Fees at 8, Slip No. 176684.)  While

this description does not explain the topic of the call with HUD, the Court thinks it sufficiently

detailed insofar as it states that the attorney sent an e-mail regarding a phone call with the

opposing party.  It is difficult to imagine that such an e-mail, or the underlying call itself, would

not be properly billable to a client.  Other entries seem ambiguous at first glance but make sense

in context.  For instance, on April 25, 2013, an attorney billed 30 minutes for "Review and

conference with Craig Briskin; conference with co-counsel."  (*Id.* at 64, Slip No. 237207.)  This

ambiguous entry comes into focus when one looks at the "activity" column of the time log

("Mediation") and the surrounding entries, which all concern settlement discussions.  These

contextual clues make clear that Slip No. 237207 documents an attorney's review of a settlement

offer and discussion of it with his colleagues.  There are, however, billing entries that are too

vague.  For example, on November 16, 2010, an attorney billed 1.75 hours for a "Conference call

with Janell Byrd-Chichester; conference call with M. Aronowitz and J. Daley, Craig Briskin and

Janell Byrd-Chichester; follow up."  (*Id.* at 6, Slip No. 175040.)  The absence of any subject-

matter description for these lengthy calls is not acceptable.  (*See also id.* at 10, Slip No. 177138

("Call with Jean Constantine-Davis."); *id.* at 57, Slip No. 227480 ("E-mails; conference with

Craig Briskin; e-mail to co-counsel."); AARP Fees at 5, Slip No. 3835 ("Emailed to Robert

Williams with questions."); *id.* at 7, Slip No. 3843 ("Emails with Brian Wolfman."); *id.* at 10,

Slip No. 3855 ("Emails to M. Aronowitz.").)

---

magistrate and discuss our reply; e-mails."); *id.* at 66, Slip No. 239829 ("Review draft letter to
opposing counsel regarding 95% resistance; e-mails."); *id.* at 70, Slip No. 245351 ("New bill
passed by house and senate and effect on claims if signed; e-mails with co-counsel."); AARP
Fees at 4, Slip No. 3833 ("Email to Brian Wolfman regarding redressability.").)

Defendant's objections are too numerous to address individually. Where a "large number of entries" are deficient "[a] fixed reduction is appropriate." *Role Models Am.*, 353 F.3d at 973. In *Role Models America*, the D.C. Circuit reduced a fee award by 50% after finding numerous and serious deficiencies. *See id.* (noting "inadequate documentation, failure to justify the number of hours sought, inconsistencies, and improper billing entries"). Plaintiffs' transgressions are not nearly so serious. Perhaps several dozen lack adequate subject-matter descriptions, and a handful more are lumped together with activities that might not warrant reimbursement. The Court believes that a 10% reduction from the hours identified by defendant is appropriate. *See Michigan v. EPA*, 254 F.3d 1087, 1095 (D.C. Cir. 2001) (*per curiam*) (reducing the fee award by 10% where "numerous entries" were "devoid of any descriptive rationale for their occurrence"); *In re InPhonic*, 674 F. Supp. 2d 273, 289 (D.D.C. 2009) (reducing final award by 5% as a result of block billing and vague time entries). To make this reduction appropriately, the Court has endeavored to calculate the value of the hours to which defendant objects and believes that amount, after adjustments to the paralegal rates, to be $63,929.89. The Court, accordingly, will reduce plaintiffs' fee award by $6,392.99.

### C. Reply

In their reply, plaintiffs assert that they have incurred $11,873.83 in fees and $405.28 in expenses since filing their original motion. (Pls.' Reply at 24.) Defendant has not had an opportunity to object to this request, but the Court has closely scrutinized plaintiffs' submissions. (*See* M&S Fees Update; M&S Expenses Update.)

As an initial matter, the updated fees request contains 3.75 hours of paralegal time billed at $195/hour for a total of $731.25.[14] As discussed above, 1.25 of those hours should have been

---

[14] (M&S Fees Update at 1, Slip Nos. 269140 and 269141; *id.* at 6, Slip No. 269210.)

billed at $145/hour and 2.5 of the hours should have been billed at $150/hour, for a total

corrected paralegal bill of $556.25.  Thus, plaintiffs' updated fee request will be reduced by

$175.

A prevailing party may recover fees incurred in filing a petition for attorney's fees, and

this Court need not inquire into whether the government's position on the fees request is

substantially justified.  *See Jean*, 496 U.S. at 162.  However, "fees for fee litigation should be

excluded to the extent that the applicant ultimately fails to prevail in such litigation."  *Id.* at 163

n.10.  Although plaintiffs were substantially successful in the present fee litigation, the Court has

rejected some aspects of plaintiffs' request, including their request for fees for pursuing Counts

I-III and their proposed hourly paralegal rate.  The Court has also reduced plaintiffs' requested

award due to vague time descriptions.  In light of these defects, the Court will apply an across-

the-board reduction of 10% to all of plaintiffs' fee-related hours.  *See Elec. Privacy Info. Ctr. v.*

*DHS*, 999 F. Supp. 2d 61, 77 (D.D.C. 2013) (reducing a fee award by 15% to account for "the

shortcomings of the [fee] petition – for example, the excessively vague billing entries and . . .

improper hourly rates").  The Court has tallied up a total of $18,810.19 expended on the fee

petition.[15]  The Court will therefore reduce plaintiffs' requested award by $1,881.02, but no

further reductions are necessary.[16]

**D.  Summary**

---

[15] This includes all of the $12,104.11 in properly billed fees and expenses from plaintiffs'
updated submission, $5,667.86 in fees billed by Mehri & Skalet in plaintiffs' original
submission, $58.35 in expenses billed by Mehri & Skalet in the original submission, and $979.87
billed by AARP.  (*See* M&S Fees Update; M&S Expenses Update; M&S Fees at 76-79; M&S
Expenses; AARP Fees at 49-50.)  Plaintiffs' attorneys do not appear to have billed any costs in
working on the fees petition.

[16] Plaintiffs' billing descriptions are much more detailed in their updated filing.  (*See, e.g.*, M&S
Fees Update at 5, No. 269110 ("Research and distinguish remaining substantially justified cases
for reply brief – Tripoli, American Wrecking Corp., et al.").)

In their original motion for fees, plaintiffs requested a total award of $293,932.40.  The Court will reduce that award by $4,102.50 to give the proper paralegal hourly rate, by $52,384.18 to account for plaintiffs' lack of success on Counts I-III, by $5,162.93 to eliminate non-compensable media-related and clerical activities, by $6,392.99 in light of plaintiffs' vague billing entries, and by $1,881.02 for plaintiffs' lack of success in the fee litigation.  The Court will increase plaintiffs' award by $12,104.11 for the work done since plaintiffs filed the original fee petition.  In short, the Court finds that plaintiffs are entitled to an award of $236,112.89.

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that plaintiffs' motion for attorneys' fees, costs, and expenses [ECF No. 51] is **GRANTED IN PART** and **DENIED IN PART**; it is further **ORDERED** that plaintiffs are **AWARDED** fees, costs, and expenses in the amount of $236,112.89.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   November 24, 2014